No. 95-080

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN THE MATTER OF THE APPLICATION FOR
BENEFICIAL WATER USE PERMIT
Nos. 63023-s76L, Rasmussen;
64988-g76L, Starner;

and

APPLICATION FOR CHANGE OF
APPROPRIATION WATER RIGHT
No. G15152-S761, Pope.

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable Dorothy McCarter, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Daniel F. Decker (argued), and John B. Carter,
                Tribal Legal Department, Confederated Salish
                and Kootenai Tribes, Pablo, Montana

                James H. Goetz (argued), Goetz, Madden & Dunn,
                Bozeman, Montana

        For Respondent:

                Hon. Joseph P. Mazurek, Attorney General,
                Harley R. Harris (argued), Assistant Attorney
                General, Helena, Montana

                Tim D. Hall (argued) and Donald D. MacIntyre,
                Special Assistant Attorneys General, Department
                of Natural Resources and Conservation,
                Helena, Montana

FILED

AUG 22 1996

Filed: Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted:  December 14, 1995

Decided:  August 22, 1996

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

On April 30, 1985, the Confederated Salish and Kootenai Tribes of the Flathead Reservation (Tribes) filed an objection with the Montana Department of Natural Resources and Conservation (DNRC) to an application by Frank Pope, a non-Indian landowner on the reservation, for an authorization to change his point of diversion and place of use of a portion of his on-reservation water right. Between February 10, 1987, and September 16, 1987, the Tribes filed objections with the DNRC to three applications from non-Indian landowners on the reservation who were seeking permits for new water rights from sources on the reservation. DNRC consolidated the Tribes' objections to all of the water permit applications, and on April 14, 1992, issued a final order in which it denied the objections. On January 12, 1995, the District Court affirmed DNRC's final order. The Tribes appeal the District Court's order. We reverse the District Court.

On appeal we address only the issue of whether DNRC has authority to grant new water use permits on the Flathead Indian reservation prior to settlement or adjudication of the Tribes' reserved water rights.

FACTUAL BACKGROUND

On October 5, 1984, Frank Pope, a non-Tribal member who owns land in fee on the Flathead Indian Reservation, filed an application with the Department of Natural Resources and Conservation for a permit to change the point of diversion and

2

place of use of a portion of his existing water right. Between August 19, 1986, and August 4, 1987, three other applicants, all of whom are non-Tribal members who own land in fee on the reservation, filed applications with DNRC to obtain permits for new water rights from sources on the reservation. Following notice of each of these applications, the Confederated Salish and Kootenai Tribes filed objections and requested that the applications be denied in their entirety.

In response to the Tribes' objections, DNRC appointed a hearing examiner and set an initial hearing date for each of the applicant's petitions. Subsequently, the Tribes moved to dismiss one of the cases for lack of jurisdiction and requested that the hearing examiner bifurcate the jurisdictional and substantive issues. The Tribes contended that the merits of the individual applications could not be decided until it was determined whether DNRC has jurisdiction to engage in water rights proceedings on the Flathead Reservation. On November 8, 1989, the hearing examiner granted the Tribes' motion to bifurcate and certified the Tribes' legal objections to DNRC's director pursuant to Rule 36.12.214, ARM.

DNRC director Karen Barclay Fagg consolidated the Tribes' objections to all of the applications. On April 30, 1990, Fagg issued an order and memorandum in which she concluded that DNRC has jurisdiction to regulate any surplus water on fee land on the

3

reservation even though Tribal reserved water rights have not yet been quantified.

The consolidated cases were subsequently remanded to the hearing examiner who issued individual "Proposals for Decision for each of the Applications." The Tribes filed exceptions to the hearing examiner's proposed decisions based on their contention that DNRC does not have jurisdiction to regulate waters on the reservation. The DNRC director then allowed a consolidated oral argument on September 26, 1991, at which the Tribes were allowed to present exceptions. On April 14, 1992, Fagg issued DNRC's final order which affirmed its previous April 30, 1990, order and clarified that it applied to "new permits for surplus, non-reserved water, and to changes [to permits for] surplus, non-reserved water, by non-Indians on fee lands within the exterior boundaries of the Flathead Indian Reservation."

On May 15, 1992, the Tribes simultaneously filed a petition for judicial review in the First Judicial District Court in Lewis and Clark County and a complaint for declaratory and injunctive relief in the United States District Court for the District of Montana. On July 24, 1992, DNRC filed a motion in the First Judicial District Court to affirm its final order regarding jurisdiction.

After considering various motions by the parties, the District Court held that the questions raised in the federal action should be resolved before the state issues, and ordered the state action

4

stayed pending a decision from the federal court. The federal court, however, ordered the federal action stayed until the state issues were resolved and permitted the Tribes to reserve the federal questions pending state court resolution. The federal court expressly held that the Tribes had properly reserved the federal claims for later review.

On January 12, 1995, the District Court, after considering oral arguments from the parties, issued its decision and order affirming DNRC's jurisdiction. The court held that DNRC has jurisdiction pursuant to the Water Use Act to issue new use permits prior to formal adjudication of existing water rights or completion of compact negotiations, that DNRC's jurisdiction to issue such permits is not suspended by § 85-2-217, MCA, and that DNRC is not collaterally estopped by the District Court's prior holding in *United States v. Department of Natural Resources and Conservation* (1st Jud. Dist. Mont. June 15, 1987), No. 50612.

## DISCUSSION

On appeal we address only the issue of whether DNRC has authority to grant new water use permits on the Flathead Indian Reservation prior to settlement or adjudication of the Tribes' water rights.[1] Because this issue is dispositive, we need not

---

[1]The Tribes have challenged DNRC's jurisdiction to issue new water use permits pursuant to § 85-2-311, MCA, and its authority to authorize changes of existing appropriation rights pursuant to § 85-2-402, MCA. Because an applicant's burden of proof is essentially the same under either statute, this Court will focus its discussion on the requirements of § 85-2-311, MCA. Our

5

address the Tribes' additional contentions that (1) DNRC's jurisdiction to issue water use permits on the reservation is suspended during the pendency of the Tribes' negotiations with the Montana Reserved Water Rights Compact Commission pursuant to § 85-2-217, MCA, and that (2) the DNRC is collaterally estopped by the same District Court's prior decision in *United States v. Department of Natural Resources and Conservation* (1st Jud. Dist. Mont. June 15, 1987), No. 50612.

This case was bifurcated prior to the DNRC hearing and the only issue decided has been whether DNRC has jurisdiction to engage in water rights proceedings on the Flathead reservation. Because this jurisdictional issue is purely legal, we review the District Court's order to determine whether its interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

Title 85, Chapter 2, MCA (Montana Water Use Act) governs the administration, control, and regulation of water rights within the state of Montana. Section 85-2-101, MCA. Among other things, the Act provides for the application and issuance of permits for the appropriation of surface water. The requirements for the issuance of water use permits are specifically set forth in § 85-2-311(1), MCA, which provides that DNRC must issue a permit if an applicant

---

decision, however, applies equally to both § 85-2-311, MCA, and § 85-2-402, MCA.

6

proves by a preponderance of the evidence that all of the following relevant criteria are met:

> (a) there are unappropriated waters in the source of supply at the proposed point of diversion;
> . . . .
> (b) the water rights of a prior appropriator will not be adversely affected;
> . . . .
> (e) the proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved . . . .

In this case, the Tribes maintain that given the undisputed fact that they possess senior unquantified reserved water rights, it is impossible for a water permit applicant to prove (1) that there are unappropriated waters in the source of supply pursuant to § 85-2-311(1)(a), MCA; (2) that the Tribes' rights as a prior appropriator will not be adversely affected pursuant to § 85-2-311(1)(b), MCA; and (3) that the applicant's proposed use will not interfere with the Tribes' planned uses for which water has been reserved pursuant to § 85-2-311(1)(e), MCA. The Tribes contend that until their reserved water rights have been quantified by a compact negotiation pursuant to § 85-2-702, MCA, or by a general *inter sese* water rights adjudication, an applicant cannot meet his burden of proof pursuant to § 85-2-311, MCA, and DNRC will not have jurisdiction to issue new water use permits on the reservation.

The District Court's decision regarding DNRC's jurisdiction to issue water use permits on the reservation pursuant to

7

§ 85-2-311(1), MCA, discussed only the applicant's burden to meet the requirements of subsections (a) and (b). Although the Tribes contended that the existing water rights must first be adjudicated and the Tribes' reserved water rights quantified before an applicant could prove that there is unappropriated water available for new use and that the rights of a prior appropriator would not be adversely affected, DNRC maintained, and the District Court agreed that "the applicant need only show that there is water available at the proposed point of diversion, and thus not appropriated, giving the applicant potential, adjudicable water rights to the surplus water."

The District Court's decision rested, in part, on its determination that "appropriated waters" do not include Indian reserved water rights, and therefore, that the Tribes are not "prior appropriators," as contemplated by § 85-2-311(1)(a) and (b). In its decision and order, the court specifically held that:

> Section 85-2-102(1), MCA, defines "appropriate" as to "divert, impound, or withdraw (including by stock for stock water) a quantity of water . . . ." Section 85-2-301, MCA, provides that a person may not appropriate water except as provided in chapter 2 of the Water Use Act. Section 85-2-302, MCA, states that "[e]xcept as otherwise provided in (1) through (3) of 85-2-306, a person may not appropriate water . . . except by applying for and receiving a permit from the department." Section 85-2-311, MCA, sets forth the criteria for issuance of a permit. Subsection (6) provides that any appropriation contrary to the provision of the section is invalid.
>
> Clearly, the language of these sections leads one to conclude that appropriated water is water that has been allocated by the permit process provided in that chapter,

and the amount of water used should reflect the amount allocated by permit.

> This conclusion addresses the Tribes' contention that an applicant cannot prove the availability of unappropriated water unless the water supply has been quantified. The statutory scheme does not require it.

(Emphasis added.)

This Court has long recognized a distinction between state appropriative water rights and Indian reserved water rights. In *State ex rel. Greely v. Confederated Salish and Kootenai Tribes of the Flathead Reservation* (1985), 219 Mont. 76, 89-90, 712 P.2d 754, 762, we noted that:

> State appropriative water rights and Indian reserved water rights differ in origin and definition. State-created water rights are defined and governed by state law. Indian reserved water rights are created or recognized by federal treaty, federal statutes or executive order and are governed by federal law.
>
> . . . .
>
> Appropriative rights are based on actual use. Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of the water.

(Citations omitted.)

We also distinguished reserved rights on the basis that they need not be diverted from the stream when we observed that:

> The right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is non-consumptive. A reserved right for hunting and fishing purposes "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive right applies" [*United States v.*] *Adair* [(9th Cir. 1983)], 723 F.2d [1394,] 1411 [*cert. denied*, 104 U.S. 3536 (1984)].

The Supreme Court has also held that under the implied-reservation-of-water-rights doctrine, Indians are entitled to sufficient water "to develop, preserve, produce or sustain food and other resources of the reservation, to make it livable." *Arizona v. California* [(1963)], 373 U.S. [546,] 599-600. "[I]ndian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secured so much as, but no more than, is necessary to provide the Indians with a livelihood--that is to say, a moderate living." *Washington v. Fishing Vessel Ass'n* [(1979)], 443 U.S. [658,] 686.

The *Winters* Court held that reserved water on the Fort Belknap Reservation could be beneficially used for "acts of civilization" as well as for agricultural purposes. *Winters v.* [*United States* (1908)], 207 U.S. [564,] 576. It may be that such "acts of civilization" will include consumptive uses for industrial purposes. We have not found decisive federal cases on the extent of Indian water rights for uses classed as "acts of civilization."

It is clear, however, that Indian reserved water rights may include future uses. *Arizona v. California*, 373 U.S. at 600-01, 83 S.Ct. at 1498; *United States v. Ahtanum Irrigation District* (9th Cir. 1964), 330 F.2d 897, 914. Most reservations have used only a fraction of their reserved water. National Water Commission, *Water Policies for the Future* 51-61 (1973). However, reserved rights may reflect future need as well as present use. For example, the "practically irrigable acreage" standard applies to future irrigation or reservation land, not present irrigation practices and current consumptive uses.

*Greely*, 219 Mont. at 93-94, 712 P.2d at 764-65.

In addition, the Montana Water Use Act, as amended in 1985, reflects the distinction between federal and Indian reserved water rights and state-created appropriative rights. *See, e.g.*, § 85-2-224, MCA (statement of claim for federal reserved water rights); § 85-2-234(2), MCA (terms of negotiated Indian water rights compact must be included in final decree without alteration); § 85-2-234(3), MCA (final decree must establish existing rights and

10

priorities of Indian tribe possessing water rights arising under federal law); and §§ 85-2-701 through -705, MCA (establishing reserved water rights compact commission to negotiate with Indian tribes to quantify Indian reserved water rights).

Therefore, an applicant's proof in satisfaction of § 85-2-311(1)(a) and (b), MCA, does not satisfy the requirement of § 85-2-311(1)(e), MCA, that his "proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved."

Because of the nature of Indian reserved water rights and because of the fact that the Tribes' rights have not yet been quantified, the Tribes contend that an applicant cannot meet this statutory burden and that DNRC cannot issue a permit consistent with the Montana Water Use Act's statutory scheme.

Although the argument was neither made in the District Court nor in its brief on appeal, DNRC asserted during oral argument, without citation to authority, that § 85-2-311(1)(e), MCA, does not pertain to Indian reserved water rights, but only to those rights reserved by the state or the United States pursuant to § 85-2-316, MCA. However, there is no basis from the plain language of § 85-2-311, MCA, for making that distinction. Furthermore, were we to construe § -311 to exclude Indian reserved rights as opposed to all others, we would be ignoring the admonition in *Greely* which served as the very premise for our conclusion that the Montana

Water Use Act was adequate on its face to adjudicate Indian reserved water rights. There we stated:

> We presume that the Water Court will not apply these code sections in an improper manner to the claimants of Indian reserved water rights. Federal Indian law must be applied in these areas as well.
>
> . . . .
>
> In a similar manner, it may be contended that Section 85-2-316, MCA, which limits the reservation of future uses to certain river basins, sets forth an improper limitation on Indian reserved rights. We also presume that the Water Court will not apply these statutes without regard to controlling federal law on Indian water rights.
>
> We recognize that the Water Use Act of Montana does not explicitly state that the Water Court shall apply federal law in adjudicating Indian reserved rights. However, we conclude that is not fatal to the adequacy of the Act on its face. We hold that state courts are required to follow federal law with regard to those water rights.

*Greely*, 219 Mont. at 94-95, 712 P.2d at 765-66.

DNRC further maintains that even if § 85-2-311(1)(e), MCA, does contemplate Indian reserved water rights, an applicant for a water use permit may still, prior to quantification of the Tribes' reserved rights, prove that his proposed use will not interfere with those rights. DNRC contends that, because any new water rights permits it issues are subordinate to the senior rights of the Tribes, the Tribes would not be prejudiced by the issuance of such permits.

It is undisputed that the Confederated Salish and Kootenai Tribes possess reserved water rights. *Winters v. United States* (1908), 207

U.S. 564; *Greely*, 219 Mont. 76, 712 P.2d 754. The Tribes and the State of Montana are presently involved in formal compact negotiations to quantify the Tribes' reserved rights on the reservation pursuant to §§ 85-2-701 through -705, MCA. Until the formal negotiations are resolved, however, the extent of the Tribes' reserved water rights remains unknown. Although it is likely that the Tribes' rights are pervasive, reserved water rights are difficult to quantify. *See United States v. Alexander* (9th Cir. 1942), 131 F.2d 359, 360 (stating that "The [Hellgate] treaty impliedly reserved all waters on the [Flathead] reservation to the Indians"); *Greely*, 219 Mont. at 92, 712 P.2d at 764 (stating that "*Winters* [Indian reserved water] rights are difficult to quantify"). It is well-established, however, that Indian reserved rights incorporate both consumptive and non-consumptive uses, both implicit and explicit uses, and both present and future uses for reservation purposes. *Greely*, 219 Mont. at 93, 94, 98, 712 P.2d at 764, 765, 768. In addition, the Tribes' reserved water rights will presumably include water for agricultural purposes, water for tribal hunting and fishing, and water for "acts of civilization." *Greely*, 219 Mont. at 92-93, 712 P.2d at 764-65. Water for agricultural purposes includes enough water to "irrigate all the practically irrigable acreage on the reservation." *Greely*, 219 Mont. at 92, 712 P.2d at 674 (quoting *Arizona v. California* (1963), 373 U.S. 546, 600). Non-consumptive water use for tribal hunting and

13

fishing rights "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive right applies." *Greely*, 219 Mont. at 93, 712 P.2d at 764 (quoting *United States v. Adair* (9th Cir. 1983), 723 F.2d 1394, 1411). *See also Joint Bd. of Control v. United States* (9th Cir. 1987), 832 F.2d 1127, 1131-32, *cert. denied* (1988), 486 U.S. 1007 (stating that the Tribes' aboriginal fishing rights secured by treaty include the right to maintain instream flows and reservoir pools at levels designed to protect tribal fisheries, regardless of the effect on junior claimants to reservation waters). Water for "acts of civilization," includes water to "develop, preserve, produce or sustain food and other resources of the reservation, to make it liveable," and may also include consumptive uses for industrial purposes. *Greely*, 219 Mont. at 93, 712 P.2d at 764, 765 (quoting *Arizona v. California* (1963), 373 U.S. 546, 599-600).

Although the scope and extent of the Tribes' reserved water rights have not been resolved and are not at issue in this case, the elusive nature of Indian reserved water rights underscores both the difficulty of quantifying those rights and the difficulty a water permit applicant would have proving that his proposed use will not interfere with those rights. Clearly the only way to determine if an applicant's use will unreasonably interfere with the Tribes' reserved water rights is to decide how much water is reserved and how much water is available. The Tribes maintain that

14

such a determination obviously requires quantification of their reserved water rights. DNRC maintains, however, that "the DNRC process rarely requires that the ultimate scope of an existing right be known." According to DNRC, § 85-2-313, MCA, which provides that a permit is provisional and subject to a final determination of existing water rights, is intended to permit the issuance of water use permits prior to the adjudication of existing rights.

Nothing in that section, however, relieves an applicant of his burden to meet the statutory requirements of § 85-2-311, MCA, before DNRC may issue that provisional permit. Instead of resolving doubts in favor of appropriation, the Montana Water Use Act requires an applicant to make explicit statutory showings that there are unappropriated waters in the source of supply, that the water rights of a prior appropriator will not be adversely affected, and that the proposed use will not unreasonably interfere with a planned use for which water has been reserved. Section 85-2-311, MCA. As we stated, the latter requirement is critical to our conclusion in *Greely* that the Act must be applied consistently with federal Indian law.

A reading of the Water Use Act which did not recognize the clear mandates of § 85-2-311, MCA, would promote the uncontrolled development of a valuable natural resource which, as we recognized in *Montana Power Co. v. Carey* (1984), 211 Mont. 91, 96, 685 P.2d 336, 339, would "contradict[] the spirit and purpose underlying the Water Use Act."

15

The Montana Water Use Act, our prior decision in *Greely*, and the decisions of the federal courts make it clear that an applicant for a permit to use water within the exterior boundaries of the Flathead Reservation must prove that his proposed use does not unreasonably interfere with the Tribes' reserved water rights. We hold that given the nature of Indian reserved water rights such a showing cannot be made until the Tribes' rights are quantified by a compact negotiation pursuant to § 85-2-702, MCA, or by a general *inter sese* water rights adjudication. Because an applicant's burden of proof pursuant to § 85-2-311(1)(e), MCA, may not be satisfied until the Tribes' reserved water rights are quantified, we further hold that DNRC does not have authority to grant water use permits on the reservation until that quantification is complete.

Accordingly, we reverse the order of the District Court which held that DNRC has jurisdiction pursuant to the Water Use Act to issue new use permits prior to formal adjudication of the Tribes' reserved water rights or completion of compact negotiations.

_____
Justice

16

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice James C. Nelson specially concurs.

I concur with the analysis and result of our decision and have, accordingly, signed the opinion. In doing so, I, nevertheless, question the necessity for our taking this approach, given the fact that in 1987, DNRC unsuccessfully litigated the exact issues that are now before us in the same District Court. Under such circumstances, the doctrine of collateral estoppel should, and in my view, does preclude DNRC from relitigating those very same issues again here.

The doctrine of collateral estoppel or issue preclusion bars a party against whom the claim is asserted from relitigating an issue that the party previously litigated. Peschel v. Jones (1988), 232 Mont. 516, 521, 760 P.2d 51, 54. The bar extends to all questions essential to the judgment which were determined by a prior judgment. Haines Pipeline Const. v. Montana Power (1994), 265 Mont. 282, 288, 876 P.2d 632, 636. Collateral estoppel refers to a preclusion of issues and is distinct from res judicata which refers to a preclusion of claims. Peschel, 760 P.2d at 54; see also Boyd v. First Interstate Bank (1992), 253 Mont. 214, 218, 833 P.2d 149, 151.

We apply a three-prong test to determine whether collateral estoppel applies in a given case:

> 1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?
>
> 2) Was there a final judgment on the merits?

18

3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

Peschel, 760 P.2d at 54 (quoting Aetna Life Ins. Co. v. McElvain (1986), 221 Mont. 138, 146, 717 P.2d 1081, 1086). This Court has further held that upon an affirmative answer to all three questions, collateral estoppel bars litigation regarding an issue in trial which was previously litigated in either a civil or criminal trial. Peschel, 760 P.2d at 54.

The Tribes contend that the issue of DNRC's authority to grant new water use permits on the Flathead Indian Reservation prior to settlement or adjudication of the Tribes' reserved water rights has been previously litigated in a civil trial in Montana district court. On June 15, 1987, the Montana First Judicial District Court, the Honorable Gordon R. Bennett (now retired), presiding, entered its opinion and order reversing DNRC's final decision to issue a provisional permit to appropriate water to Don Brown and Jerry Wallem. See United States and Montana Power Co. v. Department of Natural Resources (Don Brown) (D. Mont. June 15, 1987), No. 50612. Specifically, the court construed § 85-2-311, MCA, and held that DNRC did not have the authority to issue a permit for a new water application when questions of senior conflicting claims had been raised.

In Don Brown, a junior claimant sought a permit for a new water appropriation. The Montana Power Company and the United States Bureau of Reclamation timely objected on the grounds that there were no unappropriated waters available and that their rights

as prior appropriators would be adversely affected by DNRC's granting a new permit. DNRC contended, as it did in the instant case, that the permits would not adversely affect the rights of the prior appropriators. The court stated that there is:

> only one way to determine if an unappropriated water right exists in a source of supply: decide how much water is available and how much of it has been appropriated. This obviously requires quantification of existing rights. There is, likewise, only one way to determine whether the water rights of prior appropriators will be adversely affected by additional appropriation. You must begin by determining what the water rights of the prior appropriators are. In either case, the need to determine existing water rights is inescapable and authority to make such a determination is, and has been since 1973, exclusively in the district or water courts.

The court, therefore, found that DNRC did not have the authority to issue the permits under § 85-2-311, MCA, because without a quantification of existing water rights, DNRC was unable to determine if the applicant met the criteria set forth in § 85-2-311, MCA, requiring the applicant to show that there were unappropriated waters in the source of supply and that the water rights of prior appropriators would not be adversely affected. The parties to Don Brown, including DNRC, reached a stipulation and did not appeal the district court's findings in its order and opinion. Therefore, the judgment of the district court is final and subject to the doctrine of collateral estoppel.

DNRC argues that the doctrine of collateral estoppel does not apply in the instant case because the issues raised by the Tribes do not meet the first prong of the test. Specifically, DNRC contends that the issues decided in the Don Brown case are not identical to those presented in the instant case because the

20

Montana Legislature made significant changes to § 85-2-311, MCA, in 1989. I disagree. In <u>Don Brown</u>, the district court construed the 1985 version of § 85-2-311, MCA, which provided:

> (1) Except as provided in subsections (2) through (4), the department shall issue a permit if the applicant proves by substantial credible evidence that the following criteria are met:
> (a) there are unappropriated waters in the source of the supply . . .
> (b) the water rights of a prior appropriator will not be adversely affected;
> (e) the proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved.

Section 85-2-311, MCA (1985). Section 85-2-311, MCA (1993), the statute applicable to the instant case provides:

> (1) Except as provided in subsections <u>(3) and (4)</u>, the department shall issue a permit if the applicant proves by <u>a preponderance of the evidence</u> that the following criteria are met:
> (a) there are unappropriated waters in the source of supply <u>at the proposed point of diversion</u> . . .
> (b) the water rights of a prior appropriator will not be adversely affected . . .
> (e) the proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved;

[Emphasis added to illustrate changes from the 1985 statute.] In 1989 and 1993, the legislature amended § 85-2-311, MCA, to require a preponderance of the evidence standard of proof rather than a substantial credible evidence standard and to qualify the source of supply. However, the legislature did not make such substantial amendments to § 85-2-311, MCA, so as to alter the issues discussed by the District Court construing these statutory provisions. In fact, the issues decided in the <u>Don Brown</u> case are identical to

21

those presented in the action in question and meet the first prong of the collateral estoppel inquiry.

Moreover, the opinion and order issued by the court in <u>Don Brown</u> qualifies as a final judgment on the merits and therefore meets the second prong of the collateral estoppel inquiry. Finally, DNRC was both a party in the <u>Don Brown</u> adjudication and a party in the instant case and thereby satisfies the third prong of the collateral estoppel inquiry. Thus, in this case, each prong of the three part test is satisfied.

In <u>Don Brown</u>, the district court already adjudicated and decided issues identical to the ones presented to this Court in the instant case. The doctrine of collateral estoppel renders that court's decision dispositive. Accordingly, while I agree with the analysis and result of our opinion, the First Judicial District Court had resolved the issues in a final judgment rendering relitigation of the very same issues unnecessary. Under such circumstances, our decision here should not come as any great surprise.

_____
Justice

Justice W. William Leaphart, specially concurring.

I concur in the result reached by the Court. However, while the Court has concluded that the applicants have failed to satisfy the Montana Water Use Act, specifically, § 85-3-211, MCA, I would hold that under the principles of tribal sovereignty, the state has no jurisdiction to issue water permits on the Flathead Reservation. Montana has no jurisdiction and no regulatory authority over tribal waters until tribal sovereignty has been waived pursuant to the McCarran Amendment, 43 U.S.C. § 666. In the absence of state jurisdiction to regulate or administer tribal water, compliance with the Water Use Act is immaterial.

In the administrative hearing on the Tribes' motion to dismiss for lack of jurisdiction before the Department of Natural Resources and Conservation (DNRC), the Tribes initially argued lack of state jurisdiction based, in part, on the McCarran Amendment. In appealing DNRC's final order and simultaneously filing a complaint for relief in the United States District Court for the District of Montana, the Tribes reserved the federal questions, including the jurisdictional issue raised by the McCarran Amendment, for the

federal court[1]. For purposes of "informing" this Court, the Tribes set forth the McCarran Amendment jurisdictional issue as follows:

> The reach of the McCarran Amendment's waiver of sovereign immunity, however, extends only to state processes involving a general stream adjudication. See Dugan v. Rank, 372 U.S. 609 (1963). Obviously the present procedure, by which the DNRC proposes administratively to grant individual new water rights on a case-by-case basis does not fall within the McCarran Amendment's waiver.

Having raised the specter of lack of state regulatory jurisdiction, the Tribes nonetheless contend that the jurisdictional issue has been reserved for resolution in the federal district court and that the only issue before this Court is the interpretation of Montana statutes. The Tribes, however,

---

[1] The federal district court granted the Tribes an *England reservation* thereby allowing the Tribes to litigate their state claims in state court and then return to federal court to litigate the question of whether they are constitutionally exempt from the Montana Water Use Act. England v. Louisiana State Bd. of Medical Examiners (1964), 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440. In affirming that reservation, the Ninth Circuit held that the intent of such an *England reservation* is to allow the federal court to await the state court litigation and then, if necessary, decide the federal claims "in light of the state court's rulings." Confederated Salish v. Simonich (9th Cir. 1994), 29 F.3d 1398, 1406. The federal courts, however, have failed to reckon with the fact that the federal question (whether the tribes are constitutionally exempt from the Montana Water Use Act) presents a threshold question of jurisdiction; i.e., whether the state of Montana has any jurisdiction to apply its Water Use Act in the first instance. That fundamental question of state jurisdiction must be addressed first. The state courts cannot proceed to interpret the Water Use Act vis a vis the tribal rights unless it is first determined that the state of Montana has jurisdiction to apply the Act to tribal waters. Secondly, the state's interpretation of the Water Use Act will shed no "light" on the resolution of the issue which has been reserved for federal court. That is, whether the tribes, through their sovereignty, are exempt from the Act. It is the state court which should be awaiting resolution of the jurisdictional question in federal court, not vice versa.

cannot run with the hare and hold with the hounds on the question of jurisdiction. JOHN LYLY, EUPHUS (1579). Regardless of whether the parties seek to have us resolve the question of jurisdiction, we must do so. In re Marriage of Miller (1993), 259 Mont. 424, 426-27, 856 P.2d 1378, 1380. We cannot address the question of whether the applicants can comply with the requirements of the Water Use Act without making a threshold determination that the state had jurisdiction to apply the Water Use Act to the tribal waters in the first instance.

Indian reserved water rights are creatures of federal law and as such their existence and application are independent of state laws. Winters v. United States (1908), 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340. By virtue of their federal origin, Indian reserved water rights preempt any rights determined by state forums. Water use on a federal or Indian reservation is not subject to state regulation absent explicit federal recognition of state authority to do so. Federal Power Commission v. Oregon (1955), 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215; Colville Confederated Tribes v. Walton (9th Cir. 1981), 647 F.2d 42, 52, cert. denied 454 U.S. 1092. Such recognition of state authority can be found in the McCarran Amendment, enacted in 1952, which allows joinder of the United States in state court adjudications of water rights, and subsequently in the states' administration of such water rights, in river systems where the government owns rights. 43 U.S.C. § 666. The McCarran Amendment provides that:

> Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of

rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. . . .

The United States Supreme Court has concluded that the McCarran Amendment includes Indian reserved water rights, thus, the states have jurisdiction to adjudicate Indian water rights. Colorado River Water Conservation Dist. v. United States (1976), 424 U.S. 800, 809-10, 96 S.Ct. 1236, 1242, 47 L.Ed.2d 483, 493-94. The suit at issue in Colorado River was part of Colorado's ongoing comprehensive water adjudication. The Court was persuaded by the policy evinced in the McCarran Amendment that piecemeal adjudication of water rights in a river system should be avoided. Colorado River, 424 U.S. at 819.

> The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals.

Colorado River, 424 U.S. at 819.

In a sequel to Colorado River, the United States Supreme Court restated the important federal interest in allowing all water rights on a river system to be adjudicated in a single comprehensive state proceeding rather than piecemeal litigation. Arizona v. San Carlos Apache Tribe (1983), 463 U.S. 545, 551, 103 S.Ct. 3201, 3205, 77 L.Ed.2d 837, 846.

> The McCarran Amendment, as interpreted in Colorado River, allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of *comprehensive water adjudications.* Although

26

adjudication of those rights in federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.

San Carlos Apache, 463 U.S. at 569 (emphasis added). However, the Court added a caveat to the state courts' adjudication of Indian water rights.

[O]ur decision in no way changes the substantive law by which Indian rights in state water adjudications must be judged. State courts, as much as federal courts, have a solemn obligation to follow federal law. Moreover, any state-court decision alleged to abridge Indian water rights protected by federal law can expect to receive, if brought for review before this Court, a particularized and exacting scrutiny commensurate with the powerful federal interest in safeguarding those rights from state encroachment.

San Carlos Apache, 463 U.S. at 571. Thus, in these and other cases, federal and state courts have clearly established that states may join the United States and Indian tribes in comprehensive water rights adjudications that include all claimants along a river. See United States v. District Court in & for Water Div. No. 5 (1971), 401 U.S. 527, 91 S.Ct. 1003, 281 L.Ed.2d 284; United States v. District Court for Eagle County (1970), 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278; Dugan v. Rank (1963), 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15; In re Snake River Basin Water System (Idaho 1988), 764 P.2d 78, cert. denied 490 U.S. 1005 (1989); Elephant Butte Irrigation v. Regents of New Mexico (N.M. App. 1993), 849 P.2d 372, 375-80.

In Colville Confederated Tribes, the Ninth Circuit Court of Appeals addressed the question of when states may exert

jurisdiction over water on an Indian reservation. <u>Colville</u> <u>Confederated Tribes</u>, 647 F.2d 42. The court held that state water laws are not controlling on an Indian reservation. <u>Colville</u> <u>Confederated Tribes</u>, 647 F.2d at 53. Especially applicable in the instant case, the court quoted United States v. McIntire (9th Cir. 1939), 101 F.2d 650, 654:

> [T]he Montana statutes regarding water rights are not applicable, because Congress at no time has made such statutes controlling in the Reservation. In fact, the Montana enabling act specifically provided that Indian lands within the limits of the state, "shall remain under the absolute jurisdiction and control of the Congress of the United States."

<u>Colville Confederated Tribes</u>, 647 F.2d at 53. The court also noted that it did not perceive the McCarran Amendment as expanding the state's *regulatory* powers over water on a federal reservation.

Later, in United States v. Anderson, the Ninth Circuit revisited the issue of state authority to regulate water on Indian reservations. United States v. Anderson (9th Cir. 1984), 736 F.2d 1358. In <u>Anderson</u>, the court held that because the Indian reserved water rights in question had been quantified and were under the protection of a federal water master, the state of Washington could exercise its regulatory jurisdiction over the use of *surplus, non-reserved* Chamokane Basin waters by non-members on non-Indian fee lands within the Spokane Reservation. <u>Anderson</u>, 736 F.2d at 1366. Central to the Ninth Circuit's decision was the fact that:

> [T]he interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-government nor impact on the Tribe's economic welfare because those rights have been quantified and will be protected by the federal water master.

28

Anderson, 736 F.2d at 1366.

A year later, the Ninth Circuit restated the proposition that the McCarran Amendment waives immunity only after a general adjudication of stream water rights has been made. South Delta Water Agency v. United States (9th Cir. 1985), 767 F.2d 531, 541. Determining that a court cannot adjudicate the administration of water rights until it determines what those rights are, the court held that:

> Because there has been no prior adjudication of relative general stream water rights in this case, there can be no suit "for the administration of such rights" within the meaning of the McCarran Amendment.

South Delta, 767 F.2d at 541. Consequently, as the Tribes argue, albeit equivocally, a general stream *adjudication*, under subsection (1), must precede *administration* of federal or Indian water rights under subsection (2) of the McCarran Amendment. South Delta, 767 F.2d at 541.

In the instant case, DNRC's issuance of new water permits to non-Indians on the Flathead Reservation was not part of a general stream adjudication. See Dugan, 372 U.S. at 618. Thus, as the Tribes point out "the present procedure, by which the DNRC proposes administratively to grant individual new water rights on a case-by-case basis does not fall within the McCarran Amendment's waiver."

In passing the Indian and Federal Water Rights Act, §§ 85-2-701 through -705, MCA, the Montana Legislature recognized the unique status of Indian reserved water rights within the state adjudication system. The Act allows Montana Tribes and the Montana Reserved Water Rights Compact Commission to negotiate a resolution

29

of Indian claims rather than enter into a full McCarran *inter sese* adjudication. The Tribes' negotiations with the Montana Reserved Water Rights Compact Commission are ongoing and not yet complete. Accordingly, pursuant to § 85-2-217, MCA, "all proceedings to generally adjudicate reserved Indian water rights and federal reserved water rights of those Tribes and federal agencies which are negotiating are suspended." Until the senior tribal water rights have been identified and quantified through negotiation or adjudication, excess or surplus waters that could subsequently be available for appropriation under the Water Use Act, are unidentifiable and unquantifiable. Thus, until the compact negotiations conclude, DNRC cannot, under the McCarran Amendment, administer water permits for those drainages that are affected by reserved Indian water rights.

Consequently, in the absence of a completed adjudication or negotiation of Indian water rights, the McCarran Amendment's waiver of tribal sovereign immunity for the purposes of "administering" those rights is not triggered. Until there has been a quantification of tribal water rights, DNRC does not have jurisdiction under the McCarran Amendment to "administer" any excess waters through issuing permits--even if those permits are provisional and subject to future adjudication. See § 85-2-313, MCA.

Accordingly, I concur in the Court's conclusion that DNRC cannot grant a permit to use water on the Flathead Reservation until the Tribes' water rights are first adjudicated and

30

quantified. However, while the Court bases its decision on the applicants' failure to satisfy the Water Use Act, § 85-2-311(1)(e), MCA, I conclude that the Montana Water Use Act does not come into play unless, pursuant to the jurisdictional prerequisites of the McCarran Amendment, the Tribes' sovereignty is waived. That is, until there has been a completed adjudication or negotiation of Indian water rights, the state of Montana has no ability to quantify those rights and no jurisdiction to administer potentially surplus waters through the issuing of permits, provisional or otherwise.

_W. William Leaphart_
Justice

Chief Justice J. A. Turnage, dissenting.

I concur in the majority's starting premise that the Tribes possess a reserved water right which is unique and which has not yet been quantified. However, I must dissent from the majority's conclusion that, under Montana statutes, this right of the Tribes requires a shutdown of the water permitting process in Montana.

Section 85-2-217, MCA, provides that adjudication of Indian reserved water rights and federal reserved water rights shall be suspended during negotiations for the conclusion of a water compact. That provision recognizes the critical importance of the compacting process in determining reserved water rights in Montana, and guarantees that adjudication will accommodate the compacting process. Unquestionably, the best solution to federal reserved water rights is through compact negotiations.

The grant of a water use permit is not an adjudication of water rights, however. Under § 85-2-313, MCA, the DNRC's granting of a provisional water permit is not a final determination of water rights. Granting a water use permit under § 85-2-311, MCA, cannot deprive any Tribe of its prior rights, due to the provisional nature of the permits.

The majority opinion will result in a shutdown of not only water right adjudication, but also the preliminary decree process throughout the state, until the compacting process is completed. Counsel for the Tribes admitted as much at oral argument. Although the Tribes have argued that this decision applies only to the

32

Flathead Indian Reservation, there is hardly a watershed in Montana which is not impacted by water rights of one or more of the seven Indian reservations located within the state's boundaries. As the District Court noted, this result entirely defeats the purpose of the permit process, denying landowners after 1973 the right to any new water use or change of use until the adjudication process is completed.

The majority relies upon § 85-2-311(1), MCA, to reach its conclusion that DNRC does not have jurisdiction to issue new use permits prior to quantification of the Tribes' reserved water rights by adjudication or compact negotiations. That statute provides, in relevant part:

> [T]he department shall issue a permit if the applicant proves by a preponderance of evidence that the following criteria are met:
> (a) there are unappropriated waters in the source of supply at the proposed point of diversion:
> . . .
> (b) the water rights of a prior appropriator will not be adversely affected;
> . . .
> (e) the proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved[.]

The majority concludes that subsection (1)(e) above requires proof that the proposed use will not interfere with Indian reserved water rights. Because Indian reserved water rights have not yet been quantified, the majority reasons, such proof is impossible.

DNRC has explained, however, that the language "other planned uses or developments for which a permit has been issued or for which water has been reserved" in subsection (1)(e) refers to § 85-

33

2-316, MCA, "Reservation of waters."

> The state or any political subdivision or agency of the
> state or the United States or any agency of the United
> States may apply to the department to reserve waters for
> existing or future beneficial uses or to maintain a
> minimum flow, level, or quality of water throughout the
> year or at periods or for a length of time that the
> department designates.

Section 85-2-316(1), MCA. The statute goes on to provide an
extensive description of the process and procedure for obtaining a
reservation of water, including the basins in which water may be
reserved, the procedure for processing applications and granting
reservations, limitations on reservations, the priority of
appropriation of a water reservation, and transfers of
reservations.

The reference in § 85-2-311(1)(e), MCA, to "other planned uses
or developments for which a permit has been issued or for which
water has been reserved" relates logically and naturally to the
extensive statutory scheme a few sections thereafter for
reservation of waters. It relates considerably less logically or
naturally to the reserved water rights of Indian tribes, in
connection with which the language "for which a permit has been
issued" simply makes no sense. I conclude that the subsection
(1)(e) language upon which the Tribes rely for their argument of
statutory noncompliance does not address Indian reserved water
rights.

The majority opinion states that if § 85-2-311(1)(e), MCA,
does not address Indian reserved water rights, then the statute
ignores such rights in contravention of federal law and this

34

Court's opinion in <u>Greely</u>. There is nothing in the extremely limited factual record in this case to indicate that the proposed permit use by the applicants will interfere with Indian reserved water rights. If the statutory language lacks clarity as to the necessity for consideration of Indian reserved water rights in the permitting process, that concern should be addressed by statutory revision.

The <u>Don Brown</u> case out of the First Judicial District Court, discussed in Justice Nelson's concurring opinion, does not control by res judicata or collateral estoppel because the statutes were amended after <u>Don Brown</u> was decided. A claim of existing right is no longer <u>prima facie</u> proof of its content for all purposes, but only for "purposes of adjudicating rights pursuant to this part." Section 85-2-227, MCA. Section 85-2-311, MCA, additionally has been amended since <u>Don Brown</u>, to require that there must be unappropriated waters in the source of supply <u>at the proposed point of diversion</u> and <u>during</u> the period in which the applicant seeks to appropriate. In short, the ruling in <u>Don Brown</u> as to the effect of the <u>prima facie</u> statute on permit processing has been superseded by legislative amendment.

The jurisdictional question discussed in Justice Leaphart's concurring opinion is not presently before this Court. The Tribes have reserved the federal questions for their action for declaratory and injunctive relief in the United States District Court for the State of Montana, Confederated Salish and Kootenai Tribes v. Simonich, No. CV-92-54-M-CCL.

35

The permit process was intended to provide for new water use prior to adjudication. Now we are left with no such process. This denies landowners after 1973 the right to any new water use or change of use until the adjudication process is completed. This result is not in harmony with the purposes of the Water Use Act to "coordinate the development and use of the water resources of the state so as to effect full utilization, conservation, and protection of its water resources" and to "promote the prosperity and welfare of the people of Montana through the sound management of the state's water resources." Sections 85-1-101(3) and -103, MCA. The result reached by the majority in this case certainly was not the intended purpose of the Water Use Act, and I do not believe it is a necessary result of the statutes here interpreted.

I therefore respectfully dissent.

_____
Chief Justice

Justice Charles E. Erdmann:

I concur in the dissent of Chief Justice Turnage.

_____
Justice