No. 96-520

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 43


IN RE MARRIAGE OF

SHANE COLIN SKILLEN,

Petitioner and Respondent,

and

STACEY GALE MENZ f/k/a STACEY GALE SKILLEN,

Respondent and Appellant.


APPEAL FROM:   District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Joe L. Hegel, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Loren J. O'Toole, II; O'Toole and O'Toole;
Plentywood, Montana

For Respondent:

J. Dennis Corbin, Attorney at Law,
Miles City, Montana


Submitted on Briefs: April 4, 1997

Decided:   March 3, 1998
Filed:


_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.


¶1   The petitioner, Shane Skillen, filed a petition for dissolution of his marriage to the respondent, Stacey Skillen, in the District Court for the Sixteenth Judicial District in Rosebud County.  After a nonjury trial the District Court entered an order granting joint custody of their child, Kinsey, to Shane and Stacey.  Thereafter, the Fort Peck Tribal Court entered a temporary joint custody order in favor of Stacey, and she filed a motion to dismiss

in the District Court. The District Court first entered a final decree of dissolution, and then denied the motion to dismiss. Stacey appeals. We reverse the order of the District Court and remand this case to the District Court for proceedings consistent with this opinion.

¶2    The sole issue on appeal is whether the District Court has subject matter jurisdiction to determine the custody of an Indian child when the child, along with his enrolled mother, resides on a reservation, and the father, who is non-Indian, resides off the reservation.

### FACTUAL BACKGROUND

¶3    Shane Skillen and Stacey Menz married on May 13, 1993. They were both twenty years old and students at Dawson Community College in Glendive at the time. Two days after the marriage, Shane began work at the Rosebud County Sheriff's Department in Forsyth, where his parents reside; Stacey, an enrolled member of the Fort Peck Tribes, returned to the Fort Peck Indian Reservation and began temporary work at the Fort Peck Tribal Health Office in Poplar. On approximately August 20, 1993, Stacey stopped work at the Tribal Health Office, and on August 29, 1993, she gave birth to their son, Kinsey Charles Skillen, in Custer County. Kinsey is also an enrolled member of the Fort Peck Tribes. Shane is non-Indian.

¶4    The parties dispute if and when Stacey actually maintained a residence with her grandmother on the Fort Peck Reservation. The parties also dispute where Stacey and Kinsey maintained their residence after Kinsey's birth, although it appears clear that they spent considerable time both in Forsyth with Shane and on the Reservation with Stacey's grandmother. At all times throughout this matter, both Shane and Stacey have received substantial support and assistance from their extended families in their efforts to raise Kinsey.

¶5    In January 1994, Shane filed a petition for dissolution of the marriage in the District Court for the Sixteenth Judicial District in Rosebud County; he brought Stacey and Kinsey to Forsyth and served the petition on her there. The District Court conducted a hearing, and on February 18, 1994, granted temporary custody to both parties, with physical custody alternating every two weeks. At the time of the court's order, Shane lived in Forsyth and Stacey, apparently, resided on the Reservation.

¶6    In July 1995, the District Court conducted a nonjury trial. In January 1996, it ordered that Shane and Stacey share joint custody of Kinsey, and that Shane would be the primary residential custodian. On February 3, 1996, Stacey exercised her visitation privilege and took custody of Kinsey from Shane. She failed, however, to return Kinsey to Shane on February 10, as the parties had arranged. On February 9, 1996, she sought and received from the Fort Peck Tribal Court an order awarding her temporary custody of Kinsey. A few weeks later, Shane, with the help of the Richland County Sheriff's Department, located Stacey and Kinsey, and had Kinsey returned to him. Shane has apparently maintained physical custody of Kinsey since that time.

¶7    On March 11, 1996, Stacey filed a motion in the District Court pursuant to Rule 60, M.R.Civ.P., and Rule 12(h), M.R.Civ.P., to dismiss the case for lack of subject matter jurisdiction. She asserted that the Tribal Court had exclusive jurisdiction over the matter by virtue of Stacey's and Kinsey's residence on the Reservation at the time that Shane originally filed for dissolution, and that it exercised its jurisdiction when it granted the temporary custody order. On June 18, 1996, the District Court stated that it had jurisdiction over the case and issued its final decree of dissolution in which it granted the parties joint custody

and declared Shane to be the primary residential custodian. After the parties briefed the issue, the District Court, on July 26, 1996, found that Kinsey had significant contacts on and off the Reservation, and that as such, the District Court shared concurrent jurisdiction with the Tribal Court. Therefore, it denied the motion to dismiss.

## DISCUSSION

¶8 Does the District Court have subject matter jurisdiction to determine the custody of an Indian child when the child, along with his enrolled mother, resides on a reservation, and the father, who is non-Indian, resides off the reservation?

¶9 Whether to dismiss a claim based on lack of subject matter jurisdiction is a question of law. We review a district court's conclusion of law to determine if it is correct. See Poteat v. St. Paul Mercury Ins. Co. (1996), 277 Mont. 117, 119, 918 P.2d 677, 679. See also Matter of Beneficial Water Use Permit Nos. 66459-76L, Ciotti; 64988-G76L, Starner (1996), 278 Mont. 50, 54, 923 P.2d 1073, 1076.

¶10 A motion to dismiss based on lack of subject matter jurisdiction may be raised at any time and by either party, or by the court itself. See Rule 12(h)(3), M.R.Civ.P.; State v. Tweedy (1996), 277 Mont. 313, 315, 922 P.2d 1134, 1135; Wippert v. Blackfeet Tribe of Blackfeet Indian Reservation (1993), 260 Mont. 93, 102, 859 P.2d 420, 425. Also, a party cannot waive or confer by consent jurisdiction when there is no legal basis for the court to exercise jurisdiction. See In re Marriage of Miller (1993), 259 Mont. 424, 427, 856 P.2d 1378, 1380. Therefore, despite the District Court's intimation in its order that Stacey waived Tribal jurisdiction by indicating she would not invoke it, it was proper for Stacey to raise the issue of the District Court's jurisdiction when she did.

¶11 Stacey's challenge to the District Court's jurisdiction raises a matter of first impression before this Court: In light of Indian jurisdiction law and child custody principles, we must determine whether a district court has jurisdiction in a custody proceeding involving an Indian child and an Indian parent when both reside on Indian land, and a non-Indian parent who does not reside on Indian land. It presents this Court with a significant legal and policy question and requires that we synthesize the independently complex areas of Indian jurisdiction and child custody jurisdiction.

¶12 The issue of jurisdiction considers a court's right to determine and hear an issue. As such, it "transcends procedural considerations and involves the fundamental power and authority of the court itself." Wippert, 260 Mont. at 102, 859 P.2d at 425. Accordingly, our inquiry into the jurisdictional conflict between a tribal court and a state district court extends to the even more fundamental issue of the interaction between tribal and state authority.

> A. Tribal Jurisdiction in General

¶13 It is well established that Indian tribes maintain certain powers of self-government over reservation activities, such that states may not exercise jurisdiction regarding these areas of tribal government. The exclusive nature of Indian tribes' authority in this regard is based on two distinct grounds: (1) federal supremacy, and (2) tribal sovereignty. See White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 142-43, 100 S. Ct. 2578, 2583, 65 L. Ed. 2d 665, 672.

¶14 Congress has the authority to regulate Indian tribes, and where federal law exists, state courts lack jurisdiction. See White Mountain Apache Tribe, 448 U.S. at 142, 100 S. Ct. at 2583, 65 L. Ed. 2d at 672. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority."
New Mexico v. Mescalero Apache Tribe (1983), 462 U.S. 324, 334, 103 S. Ct. 2378, 2386, 76 L. Ed. 2d 611, 620 (stating that the application of state hunting and fishing laws to nonmembers on the reservation was preempted by federal law and the tribe's own regulatory scheme).

¶15 In the 1950s, Congress transferred to six states its civil and criminal jurisdiction over Indian lands, and allowed other states, including Montana, to assume jurisdiction by their own legislative action. See Pub. L. No. 53-280, Act of August 15, 1953, 67 Stat. 588. The 1968 Indian Civil Rights Act repealed that portion of P.L. 280 that permitted states like Montana to unilaterally assume jurisdiction over Indian lands, and thereafter required the affected tribe to consent to the state assumption of jurisdiction. See 25 U.S.C. 1321, 1322, and 1326.

¶16 Here, domestic matters are generally within the province of states (and tribes) and not Congress. See In re Burrus (1890), 136 U.S. 586, 593-94, 10 S. Ct. 850, 853, 34 L. Ed. 500, 503 ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."). As will be discussed below, Congress has in recent years legislated in the area of child custody and specifically Indian child custody. Those federal acts, however, do not govern these facts, nor do they operate presumptively to preempt state authority in favor of the tribe's authority. Moreover, Montana has not assumed jurisdiction over the Fort Peck Tribes pursuant to P.L. 280. Accordingly, the jurisdictional framework for our analysis should be based not on preemption, but on the interaction between tribal and state courts in terms of tribal sovereignty.

¶17 Where Congress has not exercised its authority over Indian tribes, tribes are generally presumed to maintain their inherent tribal sovereignty over Indian land. See Fisher v. District Court (1976), 424 U.S. 382, 96 S. Ct. 943, 47 L. Ed. 2d 106; In re Marriage of Wellman (1993), 258 Mont. 131, 137, 852 P.2d 559, 563. Without express federal law to declare the total lack of state authority, however, questions as to state versus tribal authority naturally arise. The most commonly cited method to determine whether a state has authority in a matter is the Williams infringement test: "Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." Williams v. Lee (1959), 358 U.S. 217, 220, 79 S. Ct. 269, 271, 3 L. Ed. 2d 251, 254. See also Iowa Mut. Ins. Co. v. LaPlante (1987), 480 U.S. 9, 107 S. Ct. 971, 94 L. Ed. 2d 10 (emphasizing the retained sovereignty of Indian tribes over their members and their territory where Congress has failed to assert its authority); State ex rel. Iron Bear v. District Court (1973), 162 Mont. 335, 342, 512 P.2d 1292, 1297 ("The guide lines are set down in Williams and as long as the state does not violate those guide lines and does not attempt to exercise jurisdiction over areas of the law where there is either a governing Act of Congress or an infringement on reservation self-government, it may continue to exercise jurisdiction.").

¶18 The United States Supreme Court held in Montana v. United States (1981), 450 U.S. 544, 564, 101 S. Ct. 1245, 1258, 67 L. Ed. 2d 493, 509-10, that without federal authorization, a tribe's power to exercise its sovereignty does not extend "beyond what is necessary to protect tribal self-government or to control internal relations . . . ." See also Oliphant v. Suquamish Indian Tribe (1978), 435 U.S. 191, 98 S. Ct. 1011, 55 L. Ed. 2d 209

(stating that tribal sovereignty does not authorize criminal jurisdiction over non-Indians).

¶19  More importantly, however, Montana has come to stand for the exceptions it articulated, pursuant to which tribal sovereignty dictates that a tribe has the right to exercise its jurisdiction over non-Indians and activities on Indian lands.  The first exception recognizes regulatory tribal jurisdiction over nonmembers who enter consensual relationships with the tribe or its members.  The second exception recognizes civil tribal jurisdiction over nonmember reservation conduct that threatens or directly affects the tribe's political integrity, economic security, health, or welfare.  See Montana, 450 U.S. at 565-66, 101 S. Ct. at 1258, 67 L. Ed. 2d at 510-11 (citing Williams, among others).  The Court in Strate v. A-1 Contractors (1997), 65 USLW 4298, 117 S. Ct. 1404, 1415-16, 137 L. Ed. 2d 661, 678-79, interpreted the second Montana exception to apply only when the conduct at issue presents a threat in terms of the tribe's ability to be self-governing or to control its internal relations.

¶20  Strate and Montana both cite the facts of Fisher to demonstrate when a state court's exercise of jurisdiction would trigger the second Montana exception and infringe on the tribe's sovereign ability to govern itself and to control its internal relations. Strate, 117 S. Ct. at 1412-13, 137 L. Ed. 2d at 674-75; Montana, 450 U.S. at 566, 101 S. Ct. at 1258, 67 L. Ed. 2d at 511.  Fisher involved a child custody dispute between an Indian mother and an Indian foster mother, each of whom resided on the reservation.  The Court concluded that the state court's exercise of jurisdiction would "plainly interfere" with the tribe's powers of self-government and, as a result, granted the tribal court exclusive jurisdiction to determine custody of the Indian child.  In addition to some factual similarity of Fisher to the facts now before us, we must also regard throughout our consideration of this matter two key factors on which Fisher expressly relied: (1) the risk of conflicting adjudications to the child's detriment; and (2) the fact that state exercise of jurisdiction "would cause a corresponding decline in the authority of the Tribal Court."  Fisher, 424 U.S. at 388, 96 S. Ct. at 947, 47 L. Ed. 2d at 112.

B.    Child Custody Jurisdiction

¶21  As the facts before us suggest, disputes regarding child custody, and specifically child custody jurisdiction, are extremely complicated and involve the interests of many parties. The uncertainty of an immediate change in marital and custody status is compounded by the dual demand on courts to incorporate these varied interests and to project family relationships many years into the future.  One constant amid these uncertainties is the best interests of the child standard.  See § 40-4-212, MCA (directing courts to apply the best interests of the child standard in a custody determination); Fort Peck Tribal Code, Title VI, § 304(b) (1989) ("The determination of custody shall be based on the best interests of the child.").  See also State of Arizona v. Sasse (1990), 245 Mont. 340, 348, 801 P.2d 598, 603 ("The best interests of the child have always been the most salient consideration in determining family matters where children are involved.") (Barz, J., dissenting).  Although sometimes subject to discretion in its application, the best interests of the child standard attempts to focus the parties and courts on the most vulnerable interest in these proceedings: the child's well-being.  Within this ambit, jurisdictional questions also now emphasize first and foremost a determination consistent with and supportive of the best interests of the child.

¶22  The Uniform Child Custody Jurisdiction Act (UCCJA) has been adopted by all fifty states.  Montana has codified the UCCJA at    40-7-101 to -125, MCA, and incorporates    3 of the UCCJA at    40-4-211, MCA, to determine the initial matter of child custody jurisdiction.  In conjunction with the federal Prevention of Parental Kidnaping Act (PKPA), 28 U.S.C.    1738A, the UCCJA operates to clarify which among competing jurisdictions

shall determine matters of child custody.

¶23    As a threshold matter, the UCCJA definition of "state" includes "any state, territory, or possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia" and does not specifically include Indian tribes; the PKPA uses substantially the same definition.  See § 40-7-103(10), MCA; 28 U.S.C. § 1738A(b)(8).  The omission, however, is of no consequence to the policy-based analysis of the UCCJA and the PKPA that we engage here.  Accordingly, we conclude that for the limited purpose of analogizing to the policy considerations of the UCCJA and the PKPA, to resolve the issue before us, we will compare Indian tribes to territories within the meaning of the UCCJA and the PKPA definition of "state."  See In re Larch (4th Cir. 1989), 872 F.2d 66 (Cherokee tribe is a state for purposes of the PKPA); Martinez v. Superior Court (Ariz. Ct. App. 1987), 731 P.2d 1244 (in a custody dispute between one Indian parent and one non-Indian parent, Indian tribes are states within the meaning of the UCCJA).  See also Day v. State Dep't Social & Rehab. Servs., Child Support Enforcement Div. (1995), 272 Mont. 170, 175, 900 P.2d 296, 299 ("As regards child support orders issued in Indian tribal courts, Indian tribes are deemed to be 'States,' 28 U.S.C. § 1738B(b), and are, therefore, excepted out of the definition of 'foreign states' under the provisions of the Recognition Act. Section 25-9-602(2), MCA. Additionally, judgments for support in matrimonial or family matters are not considered 'foreign judgments' under the Recognition Act.  Section 25-9-602(1), MCA.").  But see Desjarlait v. Desjarlait (Minn. Ct. App. 1985), 379 N.W.2d 139, 143 ("[T]he UCCJA does not apply to jurisdictional disputes between a state court and a tribal court"); Malaterre v. Malaterre (N.D. 1980), 293 N.W.2d 139, 144 (refusing to resolve a child custody issue between a tribal court and a state court on the basis of the UCCJA, based on the fact that the UCCJA "pertains to fact situations which involve jurisdictional disputes with sister states").

¶24    The purposes of the UCCJA are, in part, to:
        (a) avoid jurisdictional competition and conflict with courts of other
    states in matters of child custody which have in the past resulted in the shifting
    of children from state to state with harmful effects on their well-being;  . . . .
        (c) assure that litigation concerning the custody of a child takes place
    ordinarily in the state with which the child and his family have the closest
    connection and where significant evidence concerning his care, protection,
    training, and personal relationships is most readily available and that courts of
    this state decline the exercise of jurisdiction when the child and his family
    have a closer connection with another state;
        (d) discourage continuing controversies over child custody in the
    interest of greater stability of home environment and of secure family
    relationships for the child; . . . .

    Section 40-7-102(1), MCA (emphasis added).  As a California case stated, "the UCCJA seeks to limit jurisdiction rather than encourage or condone its proliferation."  In re Marriage of Hopson (Cal. Ct. App. 1980), 168 Cal. Rptr. 345, 356, 110 Cal. App. 3d 884, 899.

¶25    Likewise, the PKPA, which focuses primarily on custody modification, attempts to isolate jurisdiction in the one court which is best able to determine the best interests of the child.  The Congressional Findings and Declaration of Purpose for the PKPA state that:
        (c) The general purposes of . . . this Act . . . are to:
        (1) promote cooperation between State courts to the end that a
    determination of custody and visitation is rendered in the State which can best
    decide the case in the interest of the child;
        . . . .
        (4) discourage continuing interstate controversies over child custody in
    the interest of greater stability of home environment and of secure family
    relationships for the child;
        (5) avoid jurisdictional competition and conflict between State courts

in matters of child custody and visitation which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being; . . . .

28 U.S.C. 1738A (emphasis added).

¶26 The two laws make clear that jurisdictional disputes over custody are not in the best interest of the child. Furthermore, as will be explained more fully below, the laws seek to certify the single "state" to which the child's best interest is connected. Finally, they emphasize how important the initial determination of custody jurisdiction is, as subsequent changes in custody jurisdiction run counter to the purpose of the laws and are, therefore, presumptively disfavored.

¶27 For example, we twice recently considered the application of the PKPA in the context of child custody determination. See In re Marriage of Shupe (1996), 276 Mont. 409, 916 P.2d 744; In re Marriage of Erler (1993), 261 Mont. 65, 862 P.2d 12. Each time we held that the Montana district court lacked jurisdiction pursuant to the PKPA to modify the custody determination of another state. In Erler, we recognized that "[t]he PKPA requires full faith and credit be accorded to decisions of a jurisdiction if the court appropriately exercised jurisdiction under the PKPA standards" and that it "vests continuing jurisdiction in the original state as long as the child or one of the contestants continues to reside there."
Erler, 261 Mont. at 69-70, 862 P.2d at 15-16. Because the PKPA gives the original court continuing jurisdiction and requires that full faith and credit be given to the original determination, the Act imposes a duty on any "sister 'state'" to enforce a child custody determination that was made consistent with the UCCJA and PKPA. Thus, where a child custody determination has already been made and where the residence of the child has not changed, the PKPA enforces what effectively amounts to exclusive jurisdiction for the original court. See Shupe, 276 Mont. at 414, 916 P.2d at 747 ("[T]he PKPA sets forth standards for determining the one state with jurisdiction to modify an existing custody order."). As such, it becomes imperative that the original determination of custody jurisdiction be the correct one.

¶28 Pursuant to the UCCJA, the general rule is that the "home state" of the child should have jurisdiction to determine custody matters. See § 40-4-211(1)(a)(i), MCA. See, e.g., Hegler v. Hegler (Fla. Ct. App. 1980), 383 So. 2d 1134. Section 40-7-103(5), MCA, defines "Home state" as:
[T]he state in which the child, immediately preceding the time involved, lived with his parents, [or] a parent . . . for at least 6 consecutive months and in the case of a child less than 6 months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period.

¶29 The UCCJA permits a court to assert jurisdiction for reasons other than the child's residence, based on the child's best interests. Section 40-4-211(1)(b), MCA, sets out when it would be in the child's best interests for the state to assume jurisdiction:
(i) the child and the parents or the child and at least one contestant have a significant connection with this state; and
(ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

However, it explicitly prohibits a state from claiming jurisdiction where only the physical presence of the child would confer jurisdiction, except in limited situations of abuse or abandonment. See § 40-4-211(2), MCA. If no other state has jurisdiction, or where another state has declined to exercise jurisdiction, the state may then assert jurisdiction if it is in

the
best interest of the child.  See § 40-4-211(d), MCA.

¶30  By itself, the UCCJA could apparently support the exercise of jurisdiction by multiple states.   See Shupe, 276 Mont. 409, 916 P.2d 744 (concluding that both Montana and Utah had jurisdiction pursuant to the UCCJA).  However, when considered in conjunction with the PKPA, a clear preference emerges for the child's home state, as determined by his residence, especially in light of the interest that we recognize in avoiding future jurisdiction shifts for the child's best interests. See, e.g., Shupe, 276 Mont. 409, 916 P.2d 744 (holding that PKPA prevented Montana from exercising jurisdiction, even though neither state qualified as the child's "home state" pursuant to the UCCJA).

¶31  Of course, this says nothing about the unique status of Indian children.  The case before us ultimately turns on the jurisdictional power of a state court over an Indian parent and an Indian child who may reside on a reservation, not just on a strict application of the terms of the UCCJA.  However, the powerful policy statements reflected in these child custody laws and their commitment to the best interests of the child only take on enhanced meaning when we consider the Indian Child Welfare Act (ICWA) and the reasons that motivated Congress to enact it.
C.   Indian Child Welfare Act

¶32  In 1978, Congress passed the ICWA, 25 U.S.C. §§ 1901-63, to protect the best interests of Indian children and to promote the security of Indian tribes. See 25 U.S.C. § 1902.  Its primary means of achieving this goal was to ensure that tribes played an expanded role in custody proceedings that involved Indian children. This Court has repeatedly affirmed the intent of the ICWA and sought to implement its presumptions in favor of a tribal role in Indian child custody proceedings.  See In re Adoption of Riffle (1995), 273 Mont. 237, 902 P.2d 542 (granting the tribe, as opposed to the Bureau of Indian Affairs, ultimate authority to determine whether a child is eligible for tribal membership, and thus, final authority to determine whether a child satisfies the ICWA definition of Indian child); In re Matter of Baby Girl Doe (1993), 262 Mont. 380, 865 P.2d 1090 (stating that the ICWA is paramount to a natural parent's desire for anonymity); In re Parental Placement of M.R.D.B. (1990), 241 Mont. 455, 787 P.2d 1219 (interpreting broadly language from the tribal court to conclude that Indian child was a ward of the tribal court and subject to exclusive tribal jurisdiction pursuant to the ICWA); In re M.E.M. (1986), 223 Mont. 234, 725 P.2d 212 (recognizing a family member's right to intervene pursuant to the ICWA even after considerable steps in adoption proceeding had occurred).

¶33  The ICWA represents the federal remedy to a nationwide problem.  The problem originates from what is in the majority of cases a naturally predisposed inability of states to consider fully the best interests of Indian children in custody proceedings, specifically in the context of their Indian heritage.  In particular, Congress found after extensive hearings that "States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."  25 U.S.C. § 1901(5).  The concerns and resultant need for the ICWA are based even more on the fact that, as Congress pointed out, "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe."  25 U.S.C. § 1901(3).

¶34  The crux of the ICWA is to provide tribal courts with exclusive jurisdiction in "child custody proceedings" that involve Indian children.  However, it expressly excludes from its definition of "child custody proceedings" custody disputes arising from an award in a

marriage dissolution.  See 25 U.S.C. § 1903(1).  See also In re Bertelson (Mont. 1980), 189 Mont. 524, 531, 617 P.2d 121, 125 ("[ICWA] is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture [sic] values under circumstances in which an Indian child is placed in a foster home or other protective institution.").  Regardless of its literal nonapplication to the facts before us, we cannot ignore the fact that the ICWA "evinces an emphatic federal policy of protecting the tribal role in proceedings involving Indian children."  Barbara Ann Atwood, Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity, 36 U.C.L.A. L. Rev. 1051, 1062 (1989).

¶35  Similar to other child custody laws, the ICWA bases a court's right to assume jurisdiction on the residence of the child.  However, the ICWA manifests an even stronger presumption that jurisdictional disputes be determined exclusively on the basis of the child's residence than the UCCJA and the PKPA, which permit courts to assume jurisdiction on the additional grounds of the best interests of the child, among other things.  See Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (holding that the ICWA applied because even though the Indian children had never physically entered the reservation, their residence was officially the reservation, based on their mother's residence there); In re Adoption of Halloway (Utah 1986), 732 P.2d 962 (elevating the federal policies of the ICWA over state law regarding abandonment and domicile).

¶36  In effect, Congress declared through the ICWA that a custody determination by the tribal court is unequivocally in the best interests of the child when the child resides on Indian land.  It states:

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law.  Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

25 U.S.C. § 1911(a).  Where the child does not reside on Indian land, the ICWA directs the state court, "in the absence of good cause to the contrary, [to] transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent . . . or the Indian custodian or the Indian child's tribe."  25 U.S.C. § 1911(b).  Either way, the tribal court is presumed to have jurisdiction over a custody proceeding that involves an Indian child.

¶37  The value of the ICWA for purposes of the jurisdictional analysis before us is three-fold.

¶38  First, that Congress felt the need to curtail states in these matters indicates that state courts are apt to exercise jurisdiction when the best interests of the Indian child do not necessarily support that assumption of jurisdiction.  In other words, it puts states on notice that they are, in fact, a significant part of the problem, and that they should weigh their potential assumption of jurisdiction very judiciously.  See, e.g., In re M.E.M. (1981), 195 Mont. 329, 339, 635 P.2d 1313, 1319 ("The purpose of the [ICWA] is to remove as far as possible the white man's perceptions in these matters where Indian values may conflict.") (Sheehy, J., dissenting).

¶39  Second, the ICWA indicates that regardless of the child's residence, tribal courts are uniquely and inherently more qualified than state courts to determine custody in the best

interests of an Indian child.  Relatedly, it accentuates that custody matters that involve Indian
children implicate a broader range of concerns than custody matters that do not involve Indian children, and furthermore, that those interests are of great importance to the United States, and of course, to the integrity of Indian tribes.  Despite the ICWA's nonapplication to dissolution-based custody disputes, we also recognize that the tribal court's experience and abilities in these areas are inherent advantages over state courts and remain as such when the custody matter before a tribal court happens to occur pursuant to a marriage dissolution.  See generally Bertelson, 189 Mont. at 539, 617 P.2d at 129 ("Presumably the tribal court is better equipped to consider the ethnic identity as a factor in determining the child's welfare than is a state court.").  In either case, the best interests of the child standard takes on expanded meaning to tribal courts.

¶40  Finally, the ICWA demonstrates confidence in the tribal forum, not only for the substantive expertise of its perspective, but also for its ability to make a fair and appropriate
determination and to serve the interests of all the parties, including the state.  See, e.g., In re
M.R.D.B., 241 Mont. at 463, 787 P.2d at 1224 ("We are fully confident the Tribal Court will consider the best interest of all parties in making its . . . determination."); Halloway, 732 P.2d at 972 ("[W]e are confident that the courts of the [tribe] will give the [custody matter] the careful attention it deserves and will act with the utmost concern for [the Indian child's] well-being.").  The ICWA also demands that state courts give full faith and credit to the decisions of the tribal court.  See 25 U.S.C. § 1911(d).  Therefore, we appreciate that in terms of our jurisdiction analysis, any disregard for the clear policy behind the ICWA preferences for a tribal determination instead of a state determination would at least in part provoke a "decline in the authority of the Tribal Court."  Fisher, 424 U.S. at 388, 96 S. Ct. at 947, 47 L. Ed. 2d at 112.

D.  Jurisdiction of Montana State Courts Over Indian Activity

¶41  This Court has frequently recognized and upheld the sovereignty of Indian tribes to maintain their rights of self-government and to control the internal relations of their members.  See In re Custody of Zier (1988), 230 Mont. 464, 750 P.2d 1083; In re Marriage of Limpy (1981), 195 Mont. 314, 636 P.2d 266; State ex rel. Stewart v. District Court (1980), 187 Mont. 209, 609 P.2d 290.

¶42  Our analysis of jurisdictional disputes between tribal courts and state courts has followed two different lines, depending upon whether the jurisdictional dispute arose from a regulatory matter or an adjudicatory one.

¶43  The majority of our decisions that involve adjudicatory matters, and in particular domestic matters, follow a sovereignty analysis and apply the three-part test from State ex rel. Iron Bear v. District Court (1973), 162 Mont. 335, 512 P.2d 1292, to determine whether a district court can exercise jurisdiction.  See, e.g., Limpy, 195 Mont. at 318, 636 P.2d at 268;
Stewart, 187 Mont. at 212-13, 609 P.2d at 292.  See also Krause v. Neuman (1997), 943 P.2d 1328, 54 St. Rep. 937 (applying Iron Bear in a dispute regarding Indian trust land); Lambert v. Ryozik (1994), 268 Mont. 219, 886 P.2d 378 (applying Iron Bear in a dispute regarding an on-reservation auto accident).  In Iron Bear, 162 Mont. at 346, 512 P.2d at 1299, we stated:

> Before a district court can assume jurisdiction in any matter submitted to it, it
> must find subject matter jurisdiction by determining: (1) whether the federal
> treaties and statutes applicable have preempted state jurisdiction; (2) whether
> the exercise of state jurisdiction would interfere with reservation self-government; and
(3) whether the Tribal Court is currently exercising

jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction.

This Court, in Iron Bear, relied primarily on the U.S. Supreme Court analysis of Williams and its emphasis on tribal sovereignty to develop the above test. See Iron Bear, 162 Mont. 342-43, 512 P.2d at 1297. Even in its discussion of preemption, sovereignty remained the focus. See Iron Bear, 162 Mont. at 345, 512 P.2d at 1298 (stating that preemption must be considered with "sovereignty as a 'backdrop against which the applicable treaties and federal statutes must be read.'") (quoting McClanahan v. State Tax Comm'n of Ariz. (1973), 411 U.S. 164, 172, 93 S. Ct. 1257, 1262, 36 L. Ed. 2d 129, 136).

¶44 Our consideration of a jurisdictional conflict regarding a regulatory matter follows a preemption analysis. See State ex rel. Poll v. District Court (1993), 257 Mont. 512, 851 P.2d 405 (considering state authority to regulate gambling on a reservation); Northern Border Pipeline Co. v. State (1989), 237 Mont. 117, 772 P.2d 829 (considering state ability to tax pipeline that traversed reservation). We apply the two-part test from White Mountain Apache, 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665, which asks whether: "(1) the assertion of subject matter jurisdiction by Montana's administrative and judicial tribunals is preempted by federal law, and (2) the assertion of subject matter jurisdiction by Montana's administrative and judicial tribunals would unlawfully infringe on [the tribe's] right to make its own laws and be ruled by these laws." First v. State Dept. of Soc. & Rehab. Servs. ex rel. LaRoche (1991), 247 Mont. 465, 471, 808 P.2d 467, 470; See also Poll, 257 Mont. at 522, 851 P.2d at 411 ("The proper test for determining whether the State of Montana has regulatory authority over any activity committed on the [reservation], through its criminal statutes or otherwise, is the test set forth . . . in White Mountain Apache.") (Trieweiler, J., dissenting). That inquiry essentially "call[s] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." White Mountain Apache, 448 U.S. at 145, 100 S. Ct. at 2584, 65 L. Ed. 2d at 673. See also State v. Thomas (1988), 233 Mont. 451, 453, 760 P.2d 96, 97-98. See generally Burlington N. R.R. Co. v. Department of Pub. Serv. Regulation (1986), 221 Mont. 497, 500-01, 720 P.2d 267, 269-70 (discussing White Mountain Apache).

¶45 In First, 247 Mont. at 471, 808 P.2d at 470, this Court rejected Iron Bear and chose to apply White Mountain Apache to the issue of whether the state could enforce an out-of-state child support obligation against the off-reservation income of an Indian who resided on a reservation. We determined that because the U.S. Supreme Court is the final authority on matters involving tribes and tribal jurisdiction, and because White Mountain Apache followed Iron Bear by seven years, we should apply the test from White Mountain Apache, not Iron Bear. We subsequently applied the White Mountain Apache test in In re Marriage of Wellman (1993), 258 Mont. 131, 852 P.2d 559, which considered the state court's ability to apportion and distribute Indian trust land pursuant to the marriage dissolution of an Indian woman and her non-Indian husband.

¶46 For purposes of our analysis here, we need not revisit our decisions in First and Wellman to determine whether those claims represented an appropriate application of the White Mountain Apache preemption test. See First, 247 Mont. at 473, 808 P.2d at 472 (characterizing the matter as "collection action, and accordingly, not [a domestic affair] dominated by tribal tradition and custom."). However, to the extent that those cases create any uncertainty about which test this Court shall apply in future disputes over jurisdiction between tribal and state courts, we hold here that Iron Bear and a principally sovereignty-based analysis applies in the adjudicatory context, while the White Mountain Apache preemption test shall be the starting point in a regulatory dispute.

¶47 Although the two tests and lines of analysis appear quite similar, they are substantially

different. Either one alone represents a sufficient basis to find that the state court lacks subject matter jurisdiction. See Milbank Mut. Ins. Co. v. Eagleman (1985), 218 Mont. 58, 61, 705 P.2d 1117, 1119 (citing White Mountain Apache, 448 U.S. at 142-43, 100 S. Ct. at 2583, 65 L. Ed. 2d at 672). The sovereignty analysis pursuant to Iron Bear, although phrased to focus on the state's exercise of jurisdiction, ultimately turns on the breadth with which we define tribal sovereignty and the degree to which we recognize a tribe's exercise of jurisdiction. On the other hand, a preemption analysis of the various interests at stake, pursuant to White Mountain Apache, focuses less on the tribe as a sovereign nation and more on the sufficiency of the state or federal interest in overcoming the tribe's right to govern itself. Compare Limpy, 195 Mont. at 319, 636 P.2d at 269 (applying Iron Bear to a marriage dissolution between reservation Indians) ("Sound public policy requires that the Tribal Courts should have the jurisdiction to interpret their Tribal Constitution and Tribal law where the Indian Tribe has established a functioning forum for themselves to adjudicate controversies affecting the custody of their children.") with Wellman, 258 Mont. at 141, 852 P.2d at 565 (applying White Mountain Apache to a state court's ability to dispose of Indian trust land pursuant to a marriage dissolution) ("In short, the state's interest in the property and proceedings at issue is inconsequential compared with the federal and tribal interests at stake."). The fundamental difference is that in an adjudicatory situation, civil jurisdiction over all activity on Indian land is generally presumed to rest in the tribal court, and consequently, it requires that we analyze state exercise of jurisdiction in terms of its infringement on the tribe's inherent sovereignty. See Strate, 117 S. Ct. at 1412-13, 137 L. Ed. 2d at 674-75; Iowa Mut. Ins. Co., 480 U.S. at 18, 107 S. Ct. at 977-78, 94 L. Ed. 2d at 21; Fisher, 424 U.S. at 386-89, 96 S. Ct. at 946-47, 47 L. Ed. 2d at 110-13.

E. Concurrent v. Exclusive Jurisdiction

¶48 The issue of which court has jurisdiction to determine child custody matters pursuant to a dissolution is clearly an adjudicatory matter, and as such, we apply here the traditional sovereignty analysis of Iron Bear, Fisher, and Williams.

¶49 Limpy and Stewart both involved marriage dissolution actions, in which both parents and their children were Indian and resided on the reservation. Our decisions in those cases relied on statements from the tribe, through either its Tribal Code or its advisory opinions, that the tribe had exclusive jurisdiction over dissolution actions between its members who resided on the reservation. As such, we concluded pursuant to Iron Bear that state exercise of jurisdiction would constitute an infringement on tribal self-government. See Limpy, 195 Mont. at 318-19, 636 P.2d at 269; Stewart, 187 Mont. at 213, 609 P.2d at 292.

¶50 In Limpy and Stewart, however, we described the district court's obligation not to exercise jurisdiction as a matter of abstention based on comity, which implies that the district court shares concurrent jurisdiction with the tribal court. See Limpy, 195 Mont. at 318, 636 P.2d at 269; Stewart, 187 Mont. at 213, 609 P.2d at 292. But see Fisher, 424 U.S. at 389, 96 S. Ct. at 948, 47 L. Ed. 2d at 113 (also involving two Indian parties who resided on the reservation) ("Since the [matter] is appropriately characterized as litigation arising on the Indian reservation, the jurisdiction of the Tribal Court is exclusive."). Although practically no different to the relative parties, exclusive jurisdiction for the tribal court is substantially different as a matter of law from a district court's decision to abstain as a matter of comity, especially if we consider, as in Fisher, the potential decline of authority in the tribal court. Our decision here goes a step further than in Limpy and Stewart to recognize that difference.

¶51 The facts before us represent the first time that this Court has been asked to determine the jurisdictional rights of a district court in relation to a tribal court in a domestic matter between one Indian parent and one non-Indian parent. See Bertelson, 189 Mont. 524, 617

P.2d 121 (involving an Indian child custody dispute between Indian paternal grandparents who resided on a reservation with the child and a non-Indian mother).

¶52   In Bertelson, we implicitly applied the Iron Bear test, but held that because the mother was not an Indian and apparently did not reside on the reservation, and because the child's custody involved significant events off the reservation, the Williams-type infringement test did not apply and there was nothing to prevent the district court's exercise of jurisdiction.
Most importantly, this Court held that although the state and tribal court shared concurrent jurisdiction, the district court should consider and balance many unique factors regarding Indian child custody before it decided whether or not to exercise jurisdiction.  See Bertelson, 189 Mont. at 532-41, 617 P.2d 126-30.  See also Zier, 230 Mont. 464, 750 P.2d 1083 (applying factors from Bertelson).

¶53   Bertelson, however, provided a very cursory analysis of tribal sovereignty, based upon the fact that significant events related to the child's custody had occurred off the reservation and that Fisher and Williams applied only to actions arising on an Indian reservation.  Bertelson, 189 Mont. at 530-31, 617 P.2d at 125.

¶54   In Bertelson, we stated that the most significant factor for a district court's determination of whether to exercise jurisdiction should be the best interests of the child.  For example, in a discussion of the ICWA's applicability, we stated that "a state court should respect federal policy and consider the rights of the child and the tribe in deciding whether to accept or to decline jurisdiction."  Bertelson, 189 Mont. at 533, 617 P.2d at 126.  Later, in a discussion of conflict of laws principles, we stated that "[w]riters in this field generally
agree that any choice of law rules with regard to jurisdiction must give way to the child's welfare as the determinative touchstone for jurisdiction even though it is also the basis for deciding custody disputes on the merits."  Bertelson, 189 Mont. at 534, 617 P.2d at 127.  Finally, it held:  "Arguably, either the state or the tribe could assert jurisdiction.  The question is to determine which forum is better able to determine the best welfare of the child--the controlling principle for determining jurisdiction."  Bertelson, 189 Mont. at 538, 617 P.2d at 129.

¶55   We reiterate here that the best interests of the child should be the predominant factor in the determination of which court should have jurisdiction in a matter that involves an Indian child.  We further assert that in any matter so essential to tribal relations as a custody
matter involving an Indian parent and Indian child who reside on Indian land, we must presume that the tribal court has jurisdiction and consider the potential state exercise of jurisdiction in terms of its infringement on tribal sovereignty.  Based on these two criteria, we conclude as a matter of law that a more reasoned approach for the courts of this state is to recognize exclusive tribal jurisdiction in child custody proceedings between parents where at least one parent is an Indian and that parent resides on the reservation with an Indian child.

¶56   As a matter of sovereignty, tribes are presumed to have jurisdiction over the activity of members and non-members alike within the exterior boundaries of the reservation. See Wellman, 258 Mont. at 137, 852 P.2d at 563 ("[C]ivil jurisdiction over activities of non-Indians as well as Indians on reservation lands presumptively lies in the tribal court.") (citing
Fisher, 424 U.S. 382, 96 S. Ct. 943, 47 L. Ed. 2d 106); Gieger v. Pierce (1988), 233 Mont. 18, 20, 758 P.2d 279, 280 ("Generally civil jurisdiction over commercial activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty, provision or federal statute.") (citing Iowa Mut. Ins. Co., 480 U.S. at ___, 107 S. Ct. at 978,

94 L. Ed. 2d at 16).


¶57  Where a state court's exercise of jurisdiction would infringe on the tribe's right to govern itself, the state may not exercise jurisdiction and the tribal court is recognized as having exclusive jurisdiction.  See Fisher, 424 U.S. at 389, 96 S. Ct. at 948, 47 L. Ed. 2d at 113 ("Since the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation, the jurisdiction of the Tribal Court is exclusive.").


¶58  In Eagleman, 218 Mont. at 62, 705 P.2d at 1119-20, which involved the enforcement of a default judgment against a resident Indian, we relied on the Ninth Circuit's test to analyze potential infringement on tribal self-government:

     A tribe's interest in self-government could be implicated in one of two ways.  First, if a state or federal court resolves a dispute which was within the province of the tribal courts or other nonjudicial law-applying tribal institutions, that court would impinge upon the tribe's right to adjudicate controversies arising within it.  Second, if the dispute itself calls into question the validity or propriety of an act fairly attributable to the tribe as a governmental body, tribal self-government is drawn directly into the controversy.

     We have recognized that the tribal court is generally the exclusive forum for the adjudication of disputes affecting the interests of both Indians and non-Indians which arise on the reservation.

     R.J. Williams Co. v. Fort Belknap Hous. Auth. (9th Cir. 1983), 719 F.2d 979, 983 (involving a contract dispute over work performed on the reservation) (citations omitted).  In the specific area of child custody, in Bertleson we cited another federal case to reflect the nature of the tribe's self-governing authority:  "If tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right, within its own boundaries and membership, to provide for the care and upbringing of its young, a sine qua-non to the preservation of its identity."  Bertelson, 189 Mont. at 539, 617 P.2d at 129 (quoting Wisconsin Potowatomies v. Houston (W.D. Mich. 1973), 393 F. Supp. 719, 730, which involved the permanent custody of orphaned Indian children).


¶59  The facts before us are a variation of previously discussed situations.  They present one non-resident, non-Indian parent, and one Indian parent and an Indian child who reside on the Reservation, which indicates that a determination by the tribal court would extend the tribal authority to more than just its own members.  More importantly, the nature of a custody dispute between a resident Indian parent and a non-resident, non-Indian parent means that it lacks a clear situs either on or off the reservation.  Nonetheless, we are not without guidance about how to interpret a tribe's sovereignty and its attendant right of self-government in this context.


¶60  The ICWA is one source.  It clearly articulates how important Indian children are to the continued existence of Indian tribes within this country. See 25 U.S.C.   1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children").  Especially when Indian children reside on the reservation, they represent the single most critical resource to the tribe's ability to maintain its identity and to determine its future as a self-governing entity.  As such, we cannot think of a more legitimate and necessary manifestation of tribal self-government than the tribe's right to have a role in a custody determination of its member children who reside on the reservation with an enrolled parent.  Any exercise of state court jurisdiction over reservation Indians in a domestic matter, which is already recognized by this court as uniquely tribal in nature, much

less over the tribe's legacy--its children--would clearly infringe on the tribe's sovereign power
to govern itself and its right to keep its internal relations free from state authority. See In re M.R.D.B., 241 Mont. at 459, 787 P.2d at 1221 ("[T]hese practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.") (quoting Congressional testimony on the ICWA cited in Mississippi Band of Choctaw Indians, 490 U.S. at 34, 109 S. Ct. at 1601, 104 L. Ed. 2d at 37).

¶61  As the U.S. Supreme Court stated in Fisher, state exercise of authority may bring about a corresponding decline in tribal authority. See also Bertelson, 189 Mont. at 539, 617 P.2d at 129 ("An assumption of state court jurisdiction over Indian child custody disputes poses a substantial risk of conflicting decisions which potentially threaten a decline in tribal authority."). We decline here to undermine the tribe's position as a sovereign entity with the suggestion that merely because a resident Indian child also has significant off-reservation contacts through his non-Indian parent, its authority to exercise jurisdiction in domestic matters over its members who reside on Indian land is put in jeopardy. As the conceptual safeguard on which tribes depend to protect their identity, sovereignty must include at least the right to exercise authority over members within tribal boundaries.

¶62  Although it has yet to address these facts, the United States Supreme Court is another source for how to define the tribe's sovereignty in this context. In Montana, the second exception articulated by the Court recognized tribal jurisdiction over nonmember conduct that threatens or directly affects the tribe's political integrity, economic security, health, or welfare. See Montana, 450 U.S. at 566, 101 S. Ct. at 1258, 67 L. Ed. 2d at 511. Moreover, in Williams, the Court held that states could act only "where essential tribal relations were not involved and where the rights of Indians would not be jeopardized . . . . " Williams, 358 U.S. at 219, 79 S. Ct. at 270, 3 L. Ed. 2d at 253. We conclude that in a child custody dispute which involves an enrolled tribal member and that person's enrolled child, both of whom live within the exterior boundaries of the Reservation, state jurisdiction would threaten the tribe's political integrity and welfare, even though another party to the dispute is a non-Indian who resides off the Reservation.

¶63  At its core, our decision to recognize exclusive jurisdiction for the tribal court in a child custody matter that involves an Indian child and at least one Indian parent who reside on the Reservation is based on the best interest of the child.

¶64  We recognize in the UCCJA and the PKPA the fundamental and overwhelming opposition to jurisdictional disputes in matters of child custody. They clearly stand for the idea that as long as courts fight over who will eventually determine custody of the child, the child's future hangs in the balance, and as has been well established, that delay is not in the child's best interests.

¶65  There are, however, other significant factors in cases regarding the custody of an Indian child. The ICWA clearly reflects the expertise of the tribal courts to determine the best interests of the child in the context of his or her Indian heritage, an aspect of these children's future lives that if lost, will be difficult if not impossible to regain. This Court has frequently acknowledged the tribe's expertise as identified in the ICWA, and we have no reason now to distrust the tribal court's experience and ability to distinguish the best interests

of the child just because the terms of the ICWA do not apply to the specific facts before us. We also appreciate that domestic matters like this have the potential to be especially contentious and divisive for families, a sad fact that often inflicts greater harm on the child than the already difficult changes that occur after a marriage dissolution. The additional opportunity to contest the forum that will determine the merits of their controversy has the further potential to create animosity between the parties. Although minor in comparison to the injury to the child, we recognize that a dispute over jurisdiction could have a similarly detrimental effect on the relationship between courts and on the parties' perceptions of the court that ultimately exercises jurisdiction and makes the custody determination, which is of no advantage to either court or any of the parties. We act here, in part, to reinforce the tribal court's authority as an arm of the tribe's sovereign power, but also to eliminate public manipulation of the judicial system as a whole.

¶66 As mentioned above, our decision here goes a step further than the doctrine of abstention promulgated in Limpy and Stewart, as well as Bertelson's recognition of concurrent jurisdiction with a preference and appreciation for the attributes of tribal jurisdiction. We are motivated in part to avoid concurrent jurisdiction because it fails to serve the best interests of the child. We have in the past seen state courts and tribal courts work together in the best interest of the child. For example, in Zier we stated:

> [W]e commend both the District Court and the Crow Tribal Court for the
> obvious spirit of cooperation between them. The District Court's decision to
> defer to the Tribal Court's jurisdiction avoids competition and conflict between
> the courts, promotes the purposes of the [UCCJA] as set forth in 40-7-102,
> MCA, and discourages continuing battles for custody.

230 Mont. at 467, 750 P.2d at 1084 (affirming, pursuant to Bertelson, the district court's decision to defer jurisdiction to the tribal court). Even with cooperation by the courts, however, the ultimate custody determination was delayed significantly by the parties' ability to appeal the issue of jurisdiction, which was not in the best interests of the child. A rule of law from this Court that promotes even the threat of delay in child custody proceedings is not in the best interests of the child.

¶67 Seven Indian Reservations exist within Montana's boundary. As such, interracial marriages are a fact of life, and, as with other marriages, so are interracial divorces and custody disputes over the children of those marriages. We take seriously our obligation to the children of these marriages, as well as our obligation to respect the sovereignty of Indian tribes in relation to our own responsibility to uphold and enforce the laws of this state. See generally In re Adoption of Riffle (1996), 277 Mont. 388, 922 P.2d 510 ("[W]e stated that it was our constitutional duty to preserve the unique cultural heritage and integrity of the American Indians."); In re M.E.M. (1981), 195 Mont. 329, 333, 635 P.2d 1313 ("In applying our state law and the [ICWA] we are cognizant of our responsibility to promote and protect the unique Indian cultures of our state for all future generations of Montanans.").

¶68 We recognize here that when the child does not reside on the reservation, child custody principles do not necessarily favor recognition of exclusive jurisdiction for the tribe as clearly as when the Indian child resides on the reservation. In addition, the tribe's sovereignty is less at stake, since sovereignty is implicated most seriously in matters that involve tribal members on the reservation; although Indian children manifest a fundamental aspect of the tribe's sovereign power, when the child does not reside on the reservation the tribe's authority is not so clearly undermined by the exercise of state jurisdiction. Accordingly, we hold that when an Indian child resides off the reservation, the state court and tribal court share concurrent jurisdiction.

¶69 However, we note that even when tribal jurisdiction is not exclusive, this Court has

been reluctant to suspend the tribal court's jurisdiction just because a state court may have concurrent jurisdiction in a custody proceeding of an Indian child. See Bertelson, 189 Mont. at 532, 617 P.2d at 126 ("[W]e do not believe that state courts should, in a case of this nature, automatically assume jurisdiction. That a state court may assume jurisdiction in a case of this nature is not to say that it should.").

¶70 We held in Bertelson that prior to its choice to exercise jurisdiction, a district court should conduct a hearing "to determine which forum is better equipped to make a determination on the merits, that is, to determine the child's best interests." Bertelson, 189 Mont. at 540, 617 P.2d at 130. We directed the district court at the hearing to conduct a substantive inquiry, giving due consideration to the child's ethnic and cultural identity, as to:

> [T]he existence of tribal law or tribal customs relating to child care and custody in cases of this sort; the nature of the child's personal relationship with [his] grandparents and with [his] mother; the child's assimilation into and adjustment to life in the tribe and on the reservation; the mother's ethnic and cultural background and membership in or ties to the [tribe]; the length of the child's residence both on and off the reservation; the domicile and residence of the child's father and the child's personal relationship with [his] father.

Bertelson, 189 Mont. at 540, 617 P.2d at 130. We also directed the district court to consider §§ 40-4-211, 40-4-102, 40-4-107, 40-7-108, MCA, as well as the contacts of the child and the parents to the tribe and the state, and "the tribe's interest in deciding the custody of one of its members . . . ." Bertelson, 189 Mont. at 540, 617 P.2d at 130. In addition to these factors, a district court, when deciding whether to exercise concurrent jurisdiction, should consider the policy interests described here, and whether its exercise of jurisdiction would, for reasons specific to the facts of the case, undermine tribal authority in such a way as to infringe on the tribe's right to self-government.

## CONCLUSION

¶71 Here, the record is unclear about where the child resided when Shane initiated the dissolution. "Because the welfare of an innocent young child is at stake, we are concerned that a final decision of the jurisdictional questions presented be based on accurate factual information." Bertelson, 189 Mont. at 529, 617 P.2d at 124. Although the record indicates that Shane served Stacey with the petition for dissolution off the reservation, and that all the parties, including Kinsey, were present at the time, we reject the notion that their mere presence in Forsyth at the time is enough to establish residence and, consequently, concurrent jurisdiction for the state court. See 40-4-211(2), MCA.

¶72 Section 1-1-215, MCA, sets forth the rules that should be applied to determine a person's residence. See generally 44 Fed. Reg. 67583, 67585 (1979) (BIA guidelines stating that state law is to be relied upon in defining the term domicile as used in the ICWA). It states:

> (1) It is the place where a person remains when not called elsewhere for labor or other special or temporary purpose and to which the person returns in seasons of repose.
> (2) There may only be one residence. If a person claims a residence within Montana for any purpose, then that location is the person's residence for all purposes unless there is a specific statutory exception.
> (3) A residence cannot be lost until another is gained.
> (4) The residence of a minor's parents or, if one of them is deceased or they do not share the same residence, the residence of the parent having legal custody or, if neither parent has legal custody, the residence of the parent with whom the minor customarily resides is the residence of the unmarried minor. In case of a controversy, the district court may declare which parental

residence is the residence of an unmarried minor.

> (5) The residence of an unmarried minor who has a parent living cannot be changed by either the minor's own act or that of the minor's guardian.

> (6) The residence can be changed only by the union of act and intent.

Accordingly, these factors should guide the District Court in its determination of Stacey's and Kinsey's residence at the time that Shane filed the petition for dissolution.

¶73 We reverse the District Court's order. We remand to the District Court to determine first the residence of Stacey and the child. If it finds that Kinsey and Stacey were residents of the reservation, pursuant to our holding here, it can take no further action other than to dismiss the case. See Rule 12(h)(3) M.R.Civ.P.; Gieger v. Pierce (1988), 233 Mont. 18, 21, 758 P.2d 279, 281; In re Marriage of Lance (1984), 213 Mont. 182, 186, 690 P.2d 979, 981.

¶74 We further order the District Court, if it finds that the child was not a resident of the reservation and that it shares concurrent jurisdiction with the tribal court, to consider the factors from Bertelson that we describe above so as to determine whether the tribal court or the District Court would be better able to determine the best interests of the child.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART
/S/ WILLIAM E. HUNT, SR.

Justice James C. Nelson specially concurring in part and dissenting in part.

¶75 I concur with the majority that a district court, prior to assuming jurisdiction over a child custody proceeding when such jurisdiction is shared concurrently with a tribal court, must conduct an inquiry based on the factors enumerated in the majority opinion to determine whether the court should accept or decline to exercise that jurisdiction. Furthermore, I agree that in the case at bar the District Court record is unclear as to the residency of both Stacey and Kinsey. In this regard, due to the importance, complexity and sensitivity of this case, I concur with the majority's decision to remand this case to the District Court to determine Stacey's and Kinsey's residence at the time Shane filed a petition for dissolution with the District Court. However, because this dissolution involves both an Indian parent and a non-Indian parent who has never resided on the Reservation as well as a child who shares each parent's heritage, I disagree with the majority that Stacey's and Kinsey's residence either on or off the Reservation is determinative of whether the Tribal Court has exclusive or concurrent subject matter jurisdiction. Rather, I would conclude that regardless of Stacey's and Kinsey's residence on or off the Fort Peck Reservation, the District Court and the Fort Peck Tribal Court share concurrent jurisdiction in this case. Consequently, the District Court should consider Stacey's and Kinsey's residence as only one of the many factors set forth in the majority opinion to determine which court would provide the most appropriate forum for determining Kinsey's custody, and, therefore, which court should exercise jurisdiction. Upon this basis, I respectfully dissent.

¶76 The express exclusion of divorce proceedings from the ICWA's coverage illustrates Congress' intent that state and tribal courts should share concurrent jurisdiction over Indian child custody proceedings arising within a divorce proceeding between an Indian parent and

a non-Indian parent. As the Fourth Circuit Court of Appeals stated:

> This statutory exclusion clearly indicates that a state court may lawfully award custody of an Indian child to a non-Indian parent in a divorce proceeding. The [ICWA] does not confer exclusive jurisdiction on either a tribal court or a state court to award custody of children in a divorce proceeding. Rather, the [ICWA] discloses that Congress recognized that there can be concurrent jurisdiction in state and tribal courts.

Larch, 872 F.2d at 69 (comparing Sanders v. Robinson (9th Cir. 1988), 864 F.2d 630, 633, cert. denied, 490 U.S. 1110 (1989)). Consideration of other case law leads to the same conclusion.

¶77  We acknowledge the exclusivity of tribal jurisdiction over dissolution actions involving tribal members residing on the reservation. See Wellman, 258 Mont. at 135-36, 852 P.2d at 562 (citing Limpy, 195 Mont. 314, 636 P.2d 266 and Stewart, 187 Mont. 209, 609 P.2d 290). Compare Fisher, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (holding that a tribal court exercised exclusive jurisdiction over a child custody dispute wherein all the parties were enrolled members residing on the reservation). However, once a dissolution action involves a non-Indian party and/or one of the parties resides off the reservation, tribal jurisdiction is no longer considered exclusive. For example, in Wellman, a tribal member brought a dissolution action in state court against her non-Indian husband, although they both resided on the Blackfeet Reservation. We noted, in dicta, that "[n]o precedent suggests that in such a case the Blackfeet Tribal Court has exclusive jurisdiction over the dissolution, or that exercise of concurrent jurisdiction by a state district court interferes with tribal self-government." Wellman, 258 Mont. at 136, 852 P.2d at 562. See also Sanders, 864 F.2d 630, 633 (without reaching the question of exclusive tribal jurisdiction, the Ninth Circuit explained that the tribal court had at least concurrent but not necessarily exclusive jurisdiction over a divorce action brought by an Indian against a non-Indian, both of whom resided on the reservation).

¶78  Similarly, the South Dakota Supreme Court has determined that once a divorce case no longer involves two tribal members residing on the reservation, the state and tribal courts exercise concurrent subject matter jurisdiction. See Wells v. Wells (S.D. 1990), 451 N.W.2d 402. In Wells, an off-reservation Indian wife brought a divorce action in state court against her Indian husband who resided on the reservation. The Court determined that the state and tribal courts exercised concurrent jurisdiction over this divorce action. Wells, 451 N.W.2d at 405-06. Under the Williams infringement test, the court determined that once the wife resided off the reservation, the state acquired an interest in the marriage and the divorce was no longer exclusively a "reservation matter." Wells, 451 N.W.2d at 405. By adjudicating the case, the state court was only exercising its own concurrent jurisdiction and the tribe was not denied the right to make and enforce its own laws. Wells, 451 N.W.2d at 405. Compare Bertelson, 189 Mont. at 537, 617 P.2d at 129 ("Indians who reside off the reservation, as a general rule have the same rights and responsibilities and are subject to the jurisdiction of state courts in the same manner as state citizens") (citing Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114).

¶79  In a subsequent case, the court explained that under this concurrent jurisdiction, the court which first obtained valid personal jurisdiction over the parties could adjudicate the case. Harris v. Young (S.D. 1991), 473 N.W.2d 141, 145. In Harris, the South Dakota Supreme Court determined that state and tribal courts share concurrent jurisdiction over divorce actions between an Indian party domiciled on a reservation and a non-Indian party domiciled elsewhere within the state. Harris, 473 N.W.2d at 145. The court explained that concurrent subject matter jurisdiction in this case was even more compelling than in Wells because one of the parties was not an enrolled member of the tribe and had never been domiciled on the reservation. Harris, 473 N.W.2d at 145.

¶80  The court considered other factors in addition to who the parties were and where they lived to affirm the trial court's exercise of jurisdiction.  The court noted that the daughter involved in the case was not yet an enrolled member and that the tribal code allowed tribal courts to have jurisdiction over this type of suit only by stipulation of the parties.  Harris, 473 N.W.2d at 145.  The court said that these two factors showed that the assertion of state concurrent jurisdiction not only passed the Williams infringement test, but that it was "compelled" by the specific provisions of the tribal code.  Harris, 473 N.W.2d at 145-46.  Finally, the court said that because the Indian wife had previously used the state court system to restrain the non-Indian father from exercising his visitation rights, she could not now say that the state court lacked subject matter jurisdiction because it infringed on tribal sovereignty.  The court considered her actions "opportunistic [and] self-serving . . . ."  Harris, 473 N.W.2d at 146.

¶81  As seen from the cases discussed above, no precedent suggests that the Fort Peck Tribal Court would exercise exclusive jurisdiction even if the District Court finds on remand that Stacey and Kinsey resided on the Reservation at the time Shane filed for dissolution in District Court.  Rather, these cases support a conclusion that the District Court and Tribal Court share concurrent jurisdiction.  Clearly then, a finding by the District Court that Stacey and Kinsey did not reside on the Reservation at the time Shane filed for dissolution in District Court provides an even more compelling basis for the same conclusion.

¶82  Having concluded that the District Court and Tribal Court share concurrent jurisdiction in this action regardless of whether Stacey and Kinsey resided on or off the Reservation, I would also point out that, in addition to the factors enumerated in the majority opinion, the Fort Peck Tribal Code itself provides guidance as to which court properly exercised jurisdiction in the present action.

¶83  First, if the District Court determines that Stacey's and Kinsey's residence was off the Reservation, the Fort Peck Tribal Code itself would preclude the Tribal Court from exercising jurisdiction over this divorce and child custody matter.  Title VI, § 301 of the Fort Peck Tribal Code, grants the tribal court subject matter jurisdiction over divorce actions and related custody proceedings involving non-Indians only if certain prerequisites are met:

> The Court shall have jurisdiction over annulment, divorce and any paternity, child custody, division of property, child support or alimony decree pursuant to such annulment or divorce, where at least one (1) party to the marriage is an Indian, and at least one (1) party has been a bona fide resident within the boundaries of the Fort Peck Reservation for a period of ninety (90) days immediately preceding the filing of the action.  [Emphasis added.]

Here, the parties do not dispute that Shane resided off the Reservation; therefore, if the evidence shows that Stacey and Kinsey did not reside on the Fort Peck Reservation at the time Shane filed for dissolution in the District Court, jurisdiction of the Fort Peck Tribal Court would not be invoked because Stacey would fail to satisfy the requisite time period.  On the other hand, if the evidence shows that Stacey and Kinsey did reside on the Reservation at the time Shane filed for dissolution in the District Court, the requirements of Title VI, § 301 of the Fort Peck Tribal Code would be satisfied and the Tribal Court could also exercise jurisdiction.

¶84  However, in the case at bar, Stacey never filed for dissolution in Tribal Court, and, consequently, she never invoked the court's jurisdiction pursuant to Title VI,  301 of the Fort Peck Tribal Code, and, therefore, her residency on or off the Reservation is immaterial.  Rather, Stacey invoked the jurisdiction of the Tribal Court pursuant to Title VI,  304a of the Fort Peck Tribal Code, by petitioning for custody of Kinsey after the District Court determined that Shane should be primary custodian.  In response to Stacey's petition, the Fort Peck Tribal Court exercised its jurisdiction and awarded her temporary custody the same

day.  Title VI, § 304a of the Fort Peck Tribal Code provides:

> The Court shall have authority to determine custody of children as between parents and legal guardians, or as between parents or legal guardians and anyone with actual physical custody of the child, either pursuant to a court order or otherwise, where there is no divorce or annulment proceeding pending.  [Emphasis added.]

¶85  Stacey's invocation of the Tribal Court's jurisdiction in this case was improper.  Once dissolution proceedings are commenced within a state district court, the state court has jurisdiction to make child custody determinations.  Section 40-4-211, MCA.  Additionally, Montana exercises continuing jurisdiction over child custody matters.  See Bertelson, 189 Mont. at 534-35, 617 P.2d at 127 (citing Cobell v. Cobell (9th Cir. 1974), 503 F.2d 790, cert. denied, 421 U.S. 999 (1975)); Cobell, 503 F.2d at 795 (citing Barbour v. Barbour (1958), 134 Mont. 317, 330 P.2d 1093).  Moreover, Title VI, § 304a of the Fort Peck Tribal Code, by its own terms, placed jurisdiction over Kinsey's custody in the District Court because the state dissolution was already pending.

¶86  In this regard, not only did Stacey improperly petition the Tribal Court for child custody, but the Fort Peck Tribal Court improperly jumped into this case with its interim custody order while the District Court was still exercising jurisdiction.  The point to be made is that while one sovereign's courts are exercising jurisdiction, another sovereign's courts should abstain until the forum court settles any attack upon its jurisdiction.  Here, Stacey did the same opportunistic, self-serving thing condemned by the South Dakota Supreme Court in Harris.  That is, Stacey happily used the District Court while things went her way, but abandoned the District Court in favor of the Tribal Court when it served her purposes to do so.  This sort of unseemly, opportunistic forum shopping is antithetical to the principles of deference and stability that the majority opinion espouses.  In fact, we condemned this very thing in Agri West v. Koyama Farms, Inc. (1997), 281 Mont. 167, 933 P.2d 808.  If Montana courts are required to abstain from interfering in on-going tribal court litigation until the tribal court determines it lacks jurisdiction or until a higher court makes that determination, Agri West, 281 Mont. at 174, 933 P.2d at 812-13, then Montana courts and litigants have the right to expect, and do expect, the same deference from tribal courts.  That is, they expect tribal courts to adhere to the same sort of abstention principle as adopted by the United States Supreme Court in National Farmers and Iowa Mutual.  See Strate, ___ U.S. at ___, 117 S.Ct. at 1410, 137 L.Ed.2d at 672.

¶87  The majority concludes that a tribal court has exclusive jurisdiction over "child custody proceedings between parents where at least one parent is an Indian and that parent resides on the reservation with an Indian child."  To support this conclusion, the majority relies primarily on the second exception to the general rule in Montana and on inapplicable statutory law as set forth in the UCCJA, the PKPA, and the ICWA.  The majority justifies this conclusion by explaining that "[a]t its core, our decision to recognize exclusive jurisdiction for the tribal court in a child custody matter that involves an Indian child and at least one Indian parent who reside on the Reservation is based on the best interest of the child."

¶88  Yet, "[o]ur case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances."  Strate, ___ U.S. at ___, 117 S.Ct. at 1409, 137 L.Ed.2d at 670 (discussing Oliphant, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, and Montana, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493).  Here, the majority strains to "give" tribal courts exclusive jurisdiction over nonmember parents in child custody proceedings involving Native American children by wedging inapplicable legislation, namely, the UCCJA, the PKPA and the ICWA, into the second Montana exception.  That is, the majority awkwardly struggles to pound a square peg into a round hole.  And, in doing so, they have destroyed the line

separating judicial and legislative authority and have improperly legislated new law to effectuate the benevolent goal of ensuring that child custody placement as between parents is in the best interests of Indian children.

¶89 While I agree that in any child custody proceeding the best interests of the child standard should factor predominantly, I disagree that based on this reason alone, this Court should disregard the fundamental concept of separation of powers. Furthermore, I disagree that the best interests of the child standard should be used as the controlling principle to determine whether a court possesses subject matter jurisdiction over a child custody case as a matter of law. Rather, only after concluding that it possesses subject matter jurisdiction should a court use the best interests of the child standard as a controlling principle to determine whether to exercise that jurisdiction. See Bertelson, 189 Mont. at 538, 617 P.2d at 129.

¶90 Admittedly, we have previously looked to the policies of nonapplicable child custody statutes which incorporate the best interests of the child standard when reviewing a court's decision to exercise subject matter jurisdiction over custody cases involving Native American children. See generally Bertelson, 189 Mont. at 533, 617 P.2d at 126 (asserting that although the ICWA did not apply to the instant case, state courts should "respect federal policy and consider the rights of the child and the tribe in deciding whether to accept or to decline jurisdiction") and Zier, 230 Mont. at 467, 750 P.2d at 1084 (commenting that the district court's deferral of jurisdiction to the tribal court in a child custody matter promotes the purposes of the UCCJA). However, to rely on nonapplicable child custody statutes which incorporate the best interests of the child standard, as the majority does, to determine as a matter of law whether a court possesses subject matter jurisdiction is again an entirely different matter. That is, by using the best interests of the child standard as a controlling principle to conclude that tribal courts possess exclusive subject matter jurisdiction over certain Indian child custody cases, the majority erroneously inserts a discretionary standard into a fundamental question of law. Nothing in our prior case law suggests that the majority's current analysis and decision is appropriate. Moreover, the majority has adopted an interpretation and application of federal law here that is directly inapposite to the provisions of the law itself and renders this rationale and the decision which incorporates it subject to attack in the federal courts.

¶91 In its discussion of general tribal jurisdiction, the majority acknowledges the general rule of Montana that, subject to two exceptions, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within the reservation, absent different Congressional direction. Montana, 450 U.S. at 563-67, 101 S.Ct. at 1257-59, 67 L.Ed.2d at 509-11. However, the majority submits that the second exception to the general rule in Montana, recognizing tribal jurisdiction over nonmember reservation conduct that threatens or directly affects the tribe's political integrity, economic security, health or welfare, applies
in this case. To support the application of the second Montana exception here, the majority compares this case to Fisher, explaining that Fisher was cited as an example of the second Montana exception in both Montana and Strate. See Montana, 450 U.S. at 566, 101 S.Ct. at 1258, 67 L.Ed.2d at 511, and Strate, ___ U.S. at ___, 117 S.Ct. at 1415, 137 L.Ed.2d at 678. With this comparison, the majority lays the foundation for the conclusion that when a child custody dispute between parents involves an enrolled member and that person's child, both of whom reside within the exterior boundaries of the reservation, tribal jurisdiction must be recognized as exclusive to avoid causing a "decline in the authority of the Tribal Court." See Fisher, 424 U.S. at 388, 96 S.Ct. at 947, 47 L.Ed.2d at 112.

¶92 However, Fisher is factually distinguishable from the case at bar, and, as such, the majority's reliance on Fisher is misplaced. Fisher involved a pre-ICWA parental rights termination and adoption proceeding in which all the parties (the foster parents, biological

mother, and Indian child) were members of the Northern Cheyenne Tribe and residents of the Northern Cheyenne Reservation. In recognizing the exclusive jurisdiction of the tribal court, the United States Supreme Court explained:

State-court jurisdiction plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised

through the Tribal Court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves. As the present record illustrates, it would create a substantial risk of conflicting adjudications affecting the custody of the child and would cause a corresponding decline in the authority of the Tribal Court.

Fisher, 424 U.S. at 388-89, 96 S.Ct. at 947, 47 L.Ed.2d at 112 (emphasis added).

¶93 Unlike in Fisher, the custody dispute in the case at bar does not involve a parental rights termination and adoption proceeding between enrolled Native Americans residing on the reservation; rather, it involves a custody dispute resulting from a dissolution proceeding between an Indian parent and a non-Indian parent. Furthermore, unlike in Fisher, the situation presently before us cannot be labeled exclusively as a "dispute arising on the reservation." Here, Kinsey's non-Indian father never resided on the Reservation. Therefore, even if Stacey did reside on the Reservation with Kinsey during the times she had physical custody, custody and visitation of Kinsey still were split between both parents and occurred both on and off the Reservation. Consequently, the holding in Fisher is distinguishable and fails to provide an avenue for including the present case within the second Montana exception, and, therefore, fails to support the majority's ultimate conclusion that the Fort Peck Tribal Court had exclusive jurisdiction if Stacey and Kinsey did reside on the Fort Peck Reservation.

¶94 Next, the majority "analogiz[es] to the policy considerations of the UCCJA and the PKPA." In doing so, the majority acknowledges that the definition of "state" used in the UCCJA and the PKPA does not specifically include Indian tribes. Despite this, the majority characterizes the omission as "of no consequence to the policy-based analysis of the UCCJA and the PKPA that we engage here." And with this disclaimer, the majority boldly states that "we will compare Indian tribes to territories within the meaning of the UCCJA and the PKPA definition of 'state.'" To support this comparison, the majority cites cases from other jurisdictions as well as our decision in Day, 272 Mont. 170, 900 P.2d 296.

¶95 Not only does our decision in Day fail to legitimize the majority's comparison, but an opinion issued by the Ninth Circuit Court of Appeals, Wilson v. Marchington (9th Cir. 1997), 127 F.3d 805, sets forth an analysis showing the impropriety of such a comparison. In Marchington, the Ninth Circuit Court of Appeals concluded that principles of comity, not principles of full faith and credit, govern whether a district court should recognize and enforce a tribal court judgment. Marchington, 127 F.3d at 808. To reach this conclusion, the court noted that, by its own terms, the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution, only applies to states. Marchington, 127 F.3d at 808. Furthermore, the court noted that the initial legislation implementing this constitutional clause, 28 U.S.C. 1738, passed in 1790 and modified in 1804, was only modified to include territories and possessions. Marchington, 127 F.3d at 808. No where were Indian tribes referenced in either the constitutional clause or the implementing legislation. Marchington, 127 F.3d at 808.

¶96 The court considered many factors to conclude that Congress did not intend to include Indian tribes under the Full Faith and Credit Clause. Marchington, 127 F.3d at 808-09. First, the court pointed out that subsequent statutes, including the ICWA, 25 U.S.C. 1901 et seq., expressly extended full faith and credit to certain tribal proceedings. Marchington, 127 F.3d at 809. The court concluded that such an inclusion would not have been necessary

if full faith and credit had already been extended to the Indian tribes. Marchington, 127 F.3d at 809. Second, the court specifically noted that Congress' separate listing of territories, possessions and Indian tribes in the ICWA indicated that Congress did not consider these terms as synonymous. Marchington, 127 F.3d at 809. Further, the court pointed out that if Congress intended to include Indian tribes under 28 U.S.C. § 1738, it could have either made specific reference to them in the 1804 amendments or made additional amendments to the statute after ambiguous judicial constructions surfaced. Marchington, 127 F.3d at 809. The court concluded:

> Given this history, it would be imprudent of us to now construe the phrase "territories and possessions" in the 1804 statute to assume the meaning of the language Congress used in the Indian Child Welfare Act ("every territory or possession of the United States, and every Indian tribe") (emphasis added) and the Indian Land Consolidation Act.
>
> Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes. Those decisions, however, are within the province of Congress or the states, not this Court. Full faith and credit is not extended to tribal judgments by the Constitution or Congressional act, and we decline to extend it judicially.

Marchington, 127 F.3d at 809.

¶97  We have previously recognized the distinction expressed in Marchington. See Wippert v. Blackfeet Tribe (1982), 201 Mont. 299, 304, 654 P.2d 512, 515 (holding that "[t]ribal court judgments are treated with the same deference shown decisions of foreign nations as a matter of comity"). See also Day, 272 Mont. 170, 900 P.2d 296. Contrary to the implication created by the majority's citation to Day that the majority's comparison of Indian tribes to territories within the definition of "state" as employed by the UCCJA and the PKPA is sound, our decision in Day did not arbitrarily include Indian tribes within the definition of "state" as set forth in the Full Faith and Credit for Child Support Orders Act, 28 U.S.C. § 1738B (1994) (Child Support Act). Rather, we employed the provisions of the Child Support Act in Day to resolve issues involving enforcement of tribal court child support orders because the Child Support Act expressly defined a "state" to include "Indian country," and, therefore, the provisions of the Child Support Act expressly applied to Indian tribes. See Day, 272 Mont. at 175-77, 900 P.2d at 299-301 (citing 28 U.S.C. § 1738B(b)).

¶98  In Day, the Child Support Enforcement Division (CSED) brought an income withholding action in state district court against Day for satisfaction of past due child support payments based on a Fort Peck Tribal Court's order modifying Day's child support obligation. Day, 272 Mont. at 173-74, 900 P.2d at 298-99. We first considered the issue of whether the Fort Peck Tribal Code's statute of limitations or Montana's longer statute of limitations applied to the action. Day, 272 Mont. at 175-77, 900 P.2d at 299-301. Initially, we determined that the district court erred in applying the Uniform Foreign Money-Judgments Recognition Act (Recognition Act) to conclude that under the Fort Peck Tribal Code's shorter statute of limitations the action was time-barred. Day, 272 Mont. at 174, 900 P.2d at 299. We explained that the Recognition Act expressly excluded from its coverage "judgments for support in matrimonial or family matters." Day, 272 Mont. at 175 , 900 P.2d at 299 (citing § 25-9-602(1), MCA). Furthermore, based on the applicability of the Child Support Act as indicated by its express inclusion of Indian tribes within its definition of "state," we concluded that Indian tribes were excepted out of the definition of "foreign states" under the provisions of the Recognition Act as well. Day, 272 Mont. at 175, 900 P.2d at 299 (citing § 25-9-602(2), MCA).

¶99  Accordingly, we turned to the governing federal Child Support Act to resolve the statute of limitations issue. The Child Support Act provided that in a child support enforcement action, " 'a court shall apply the statute of limitation of the forum State or the

State of the court that issued the order, whichever statute provides the longer period of limitation.' " Day, 272 Mont. at 175, 900 P.2d at 300 (quoting 28 U.S.C. § 1738B(g)(3)). Therefore, following the directive of the Child Support Act, we held that Montana's longer statute of limitations applied, and, consequently, CSED's action against Day was not time-barred. Day, 272 Mont. at 176-77, 900 P.2d at 300.

¶100 We next considered the issue of whether CSED could enforce a tribal court child support order without initiating an action in a state district court. Day, 272 Mont. at 177-79, 900 P.2d at 301-02. We again concluded that "[s]ince Indian tribes are deemed 'states' for the purposes of child support orders under the federal Child Support Act, Montana's Child Support Enforcement Act [, Title 40, Chapter 5, part 4, MCA,] may be employed in the instant case as well." Day, 272 Mont. at 178, 900 P.2d at 301. Accordingly, we held that Montana's Child Support Enforcement Act could be employed as one alternative to initiating a state court action to enforce tribal court child support orders. Day, 272 Mont. at 178, 900 P.2d at 301-02.

¶101 Just as in Wippert and Day, the distinction made in Marchington should be recognized and followed in this case. See Marchington, 127 F.3d at 808-09. As the majority concedes, neither the UCCJA nor the PKPA specifically include Indian tribes within the definition of "state," and, therefore, these statutes do not apply to the case at bar. Furthermore, even if applicable, the statutory provisions of the UCCJA and the PKPA were not intended to confer subject matter jurisdiction on a court, but rather only control when a court should exercise that jurisdiction. See §§ 40-7-102, -104; 28 U.S.C. § 1738A(f). See generally Harris, 473 N.W.2d at 143 (explaining that "the UCCJA assumes, but does not create, subject matter jurisdiction") and Shupe, 276 Mont. at 413-15, 916 P.2d at 746-48. Consequently, it is axiomatic that these statutory provisions should not be used to determine the existence and character of subject matter jurisdiction exercised by either the state or tribal courts.

¶102 Furthermore, in addition to considering the policies of the UCCJA and the PKPA, the majority relies heavily on the ICWA to conclude that the tribal court should exercise exclusive jurisdiction over child custody proceedings between parents involving an enrolled parent who resides on the reservation with the Indian child. This, too, is improper. The ICWA excludes from coverage "a placement based . . . upon an award, in a divorce proceeding, of custody to one of the parents." 25 U.S.C. § 1903(1). As the Bureau of Indian Affairs (BIA) commented in its guidelines for state courts:

> Child custody disputes arising in the context of divorce or separation proceedings or similar domestic relations proceedings are not covered by the [ICWA] so long as custody is awarded to one of the parents.
>
> . . . .
>
> The entire legislative history makes it clear that the [ICWA] is directed primarily at attempts to place someone other than the parent or Indian custodian in charge of raising an Indian child--whether on a permanent or temporary basis.

44 Fed. Reg. 228 (1979) at 67587. Many other jurisdictions share the view that, based on the express exclusion of divorce proceedings from the ICWA's definition of "child custody proceeding," the ICWA does not apply to child custody matters connected with divorce proceedings. See Matter of Custody of K.K.S. (Minn.App. 1993), 508 N.W.2d 813, 816; In re Custody of Sengstock (Wis.App. 1991), 477 N.W.2d 310, 312-13; Harris, 473 N.W.2d at 143 (citing Application of Defender (S.D. 1989), 435 N.W.2d 717, 721-22); In re Crystal K. (Cal.App. 3 Dist. 1990), 276 Cal.Rptr. 619, 622-24, cert. denied, 502 U.S. 862 (1991); Marriage of Baisley (Colo.App. 1987), 749 P.2d 446, 449, cert. denied, 488 U.S. 917 (1988); and Malaterre v. Malaterre (N.D. 1980), 293 N.W.2d 139, 145. See also DeMent v. Oglala Sioux Tribal Court (8th Cir. 1989), 874 F.2d 510, 514 and Larch, 872 F.2d at 69.

¶103 The majority acknowledges that the ICWA expressly excludes custody disputes arising from a marriage dissolution award. However, the majority states that "[r]egardless of its literal nonapplication to the facts before us, we cannot ignore the fact that the ICWA 'evinces an emphatic federal policy of protecting the tribal role in proceedings involving Indian children.' " In fact, the majority pronounces that "we appreciate that in terms of our jurisdiction analysis, any disregard for the clear policy behind the ICWA preferences for a tribal determination instead of a state determination would at least in part provoke a 'decline in the authority of the Tribal Court.' " In other words, the majority requires district courts to apply the provisions of the ICWA to dissolution proceedings involving custody disputes over Native American children regardless of the fact that the ICWA itself expressly excludes these proceedings from its coverage.

¶104 Certainly here, as in Marchington, tempting policy reasons exist (namely, the best interests of the child standard) to support the application of the policies underlying the UCCJA, the PKPA and the ICWA, to conclude that tribal jurisdiction should be exclusive. However, by applying these policies, the majority has unnecessarily invaded the province of the legislature. Article III, Section 1 of the Montana Constitution provides:

> The power of the government of this state is divided into three distinct branches--legislative, executive and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

¶105 Correspondent with this separation of powers clause is the statutory rule of construction that "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Simply put, the duty of the Supreme Court in interpreting a statute "is not to enact, but to expound, the law . . . ." Clark v. Olson (1934), 96 Mont. 417, 432, 31 P.2d 283, 288. As we have long stated, " '[i]t is the duty of this court to construe the law as it finds it.' " State ex rel. Durland v. Board of County Comm'rs (1937), 104 Mont. 21, 24, 64 P.2d 1060, 1062 (quoting Montana Beer Retailers Protective Ass'n v. State Bd. of Equalization (1933), 95 Mont. 30, 34, 25 P.2d 128, 130).

> "Statutes should be their own interpreter. Courts must look at the language used, and the whole of it, and derive therefrom the intention of the legislature. Where this intention is obvious there is no room for construction. When the language is plain, simple, direct and without ambiguity, the Act construes itself, and courts must presume the legislature intended what it plainly says. It is only in the case of ambiguous, doubtful and uncertain enactments that the rules and principles of interpretation can be brought into requisition. It is not allowable to interpret what has no need of interpretation."

Durland, 104 Mont. at 24-25, 64 P.2d at 1062 (quoting Smith v. Williams (1874), 2 Mont. 195, 198).

¶106 While this canon of construction is modified in federal Indian law to resolve doubtful expressions of legislative intent in favor of Native Americans, this modified canon also "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." South Carolina v. Catawba Indian Tribe, Inc. (1986), 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490, 498. In other words, " '[a] canon of construction is not a license to disregard clear expressions of tribal and congressional intent.' " Catawba Indian Tribe, 476 U.S. at 506 n. 16 (quoting DeCoteau v. District County Court (1975), 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300, 315). As the First Circuit Court of Appeals aptly explained before concluding that Maine was not subject to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, 18 U.S.C. §§ 1166-1168

(IGRA), because Congress did not expressly apply the IGRA to Maine as required by the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721-1735:

> The rule of construction [regarding the resolution of ambiguous statutory language in favor of Native Americans] to which the Tribe alludes reflects a strong federal interest in safeguarding Indian autonomy. But the rule is apposite only when Congress has blown an uncertain trumpet. If ambiguity does not loom, the occasion for preferential interpretation never arises. When as now, Congress has unambiguously expressed its intent through its choice of statutory language, courts must read the relevant laws according to their unvarnished meaning, without any judicial embroidery. So it is here: since there is no statutory ambiguity, the principle of preferential construction is not triggered.

Passamaquoddy Tribe v. State of Maine (1st Cir. 1996), 75 F.3d 784, 793 (citing Rosebud Sioux Tribe v. Kneip (1977), 430 U.S. 584, 586-87, 97 S.Ct. 1361, 1362-63, 51 L.Ed.2d 660; Catawba Indian Tribe, 476 U.S. at 506, 106 S.Ct. at 2044, 90 L.Ed.2d 490; and Rhode Island v. Narragansett Indian Tribe (1st Cir. 1994), 19 F.3d 685, 691, cert. denied, 513 U.S. 919 (1994)). See also Rumsey Indian Rancheria of Wintun Indians v. Wilson (9th Cir. 1994), 64 F.3d 1250, 1257 (holding that "although statutes benefitting Native Americans generally are construed liberally in their favor, we will not rely on this factor to contradict the plain language of a statute"). Compare Marchington, 127 F.2d at 809 (declining to judicially extend full faith and credit to tribal court judgments when neither the Constitution nor Congress had done so, despite the existence of policy reasons supporting such an extension).

¶107 Consequently, because the statutory provisions of the UCCJA, the PKPA, and the ICWA, by their own terms, are inapplicable to the case at bar, the majority's application of these provisions to justify "giving" tribal courts exclusive jurisdiction over nonmember parents in child custody proceedings involving Native American children creates improper judicial legislation. Such an imprudent violation of the constitutional prohibition against courts exercising legislative power could easily be avoided while still compelling the recognition of the best interest of the child standard simply by recognizing that the state and tribal courts share concurrent jurisdiction in these child custody matters and admonishing state courts to carefully consider, on a case by case basis, whether such jurisdiction should be assumed using the factors enunciated in the majority opinion.

¶108 Recognition of concurrent jurisdiction would allow us to follow the more flexible inquiry described in Bertelson in all interparental child custody disputes involving Native American children. That is, "[t]he matter could be more rationally approached as a question of restraint on the part of state courts in the exercise of jurisdiction, rather than an absolute absence of authority." Barbara Ann Atwood, Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity, 36 U.C.L.A. L. Rev. 1051, 1104 (1989). Such an approach would not only respect the parens patriae role of both the state and the tribe, but would also acknowledge each forum's competence in determining whether exercise of its own jurisdiction would serve the best interest of the Indian child. Not to mention that such an approach in child custody matters would also encourage the cooperation between state and tribal courts overall.

¶109 Therefore, I would affirm the District Court's conclusion that the State Court and Tribal Court share concurrent jurisdiction over this matter without regard to whether Stacey and Kinsey resided on or off the Reservation. However, I would remand this case to the District Court for consideration of the factors in Bertelson and those set forth in the majority opinion to determine whether to accept or decline to exercise concurrent jurisdiction in this action.

/S/ JAMES C. NELSON

Justice Karla M. Gray joins in the foregoing specially concurring and dissenting opinion.

/S/ KARLA M. GRAY